# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RYAN JONES,<br><br>                              Petitioner,<br><br>v.<br><br>WARREN L. MONTGOMERY,<br>Warden, et al.<br><br>                         Respondents. | Case No.:  18cv2173 LAB (DEB)<br><br>**ORDER:**<br><br>**(1) DENYING AMENDED PETITION FOR A WRIT OF HABEAS CORPUS;**<br>**(2) DENYING PETITIONER'S REQUEST FOR DISCOVERY AND/OR OTHER EVIDENTIARY DEVELOPMENT;**<br>**(3) DENYING PETITIONER'S REQUEST FOR APPOINTMENT OF COUNSEL; AND**<br>**(4) DENYING A CERTIFICATE OF APPEALBILITY** |

Ryan Jones ("Petitioner") is a state prisoner proceeding pro se and IFP with an Amended Petition for a Writ of Habeas Corpus ("Amended Petition") pursuant to 28 U.S.C. § 2254.  (ECF No. 27.)  Petitioner challenges his 2016 San Diego County Superior Court convictions in case number SCD 262580 of two counts of attempted voluntary manslaughter with infliction of great bodily injury on the victims and use of a deadly and dangerous weapon, a knife, in the commission of the offenses, two counts of assault with a deadly weapon on a firefighter with infliction of great bodily injury on the victims and use of a deadly and dangerous weapon in the commission of the offenses and two counts

of battery, for which he was sentenced to 23 years and 8 months in prison.  (Clerk's Tr. ["CT"] at 767-68 [ECF No. 38, Lodgment No. 20].)

In the Amended Petition, Petitioner claims his federal constitutional rights under the Fifth, Sixth and Fourteenth Amendments were violated due to: (1) trial court error in admitting propensity evidence, (2) trial court error in the admission of photographs into evidence, (3) juror bias, (4) judicial bias, (5) the prosecutor presenting false and perjured testimony, (6) ineffective assistance of trial counsel, (7) instructional error in self-defense instructions, (8) insufficient evidence supporting his convictions because the prosecution failed to show Petitioner did not act in self-defense, (9) cumulative error and (10) instructional error in defining a firefighter's duty.  (See ECF No. 27 at 6-94.)  Petitioner requests appointment of counsel with subpoena power to develop his claims, primarily his juror bias claim (Claim 3), and includes a list of questions for the juror.  (Id. at 22, 24-25.)

Respondent has filed an Answer and has lodged the relevant state court record.  (ECF Nos. 37-38.)  Respondent maintains habeas relief is unavailable and Petitioner isn't entitled to an evidentiary hearing on his claims because: (1) Claims 3 through 6 are procedurally defaulted, (2) Claim 9 is unexhausted and (3) in any event, the state court adjudication of each of Petitioner's claims on the merits is neither contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts.  (ECF No. 37 at 2.)  Petitioner has filed a Traverse which addresses procedural default, exhaustion, and the merits as well as reasserts his request for appointment of counsel and evidentiary development.  (ECF No. 44 at 1-13.)  The Traverse also includes an attached motion for discovery, a request for appointment of counsel and subpoena power to expand the record and develop his claims, particularly Claim 3, and a list of questions for Juror # 10, the trial judge and trial counsel.  (Id. at 14-36.)

## I.   RELEVANT PROCEDURAL HISTORY

After a jury trial, Petitioner was convicted of two counts of attempted voluntary manslaughter of a firefighter in violation of Cal. Penal Code §§ 664 and 192 (lesser included offenses of the two charged crimes of attempted murder of a firefighter, see CT

22, of which the jury found Petitioner not guilty, see CT 820-22, 825-26), with additional findings as to each count Petitioner inflicted great bodily injury on the victims in violation of Cal. Penal Code §§ 12022.7(a) and 1192.7(c)(8) and used a deadly and dangerous weapon, a knife, in the commission of the offenses, within the meaning of Cal. Penal Code §§ 12022(b)(1) and 1192.7(c)(23), two counts of assault with a deadly weapon on a firefighter in violation of Cal. Penal Code §245(c), with additional findings as to both counts Petitioner inflicted great bodily injury on the victims in violation of Cal. Penal Code §§ 12022.7(a) and 1192.7(c)(8) and used a deadly and dangerous weapon, a knife, in the commission of the offenses within the meaning of Cal. Penal Code § 1192.7(c)(23), and two counts of battery in violation of Cal. Penal Code § 242. (CT 820, 823-24, 827-28, 829-30, 835-36, 841-42.) Petitioner admitted he was previously convicted of a felony, a 2002 Merced County, California robbery conviction pursuant to Cal. Penal Code § 211, which was a serious felony prior pursuant to Cal. Penal Code §§ 667(a)(1), 668, and 1192.7(c), a strike prior pursuant to Cal. Penal Code §§ 667(b) through (i), 1170.12 and 668, and a probation denial prior pursuant to Cal. Penal Code § 1203(e)(4). (CT 820.) Petitioner was sentenced to 23 years 8 months in prison. (CT 767-68.)

On direct appeal to the state appellate court, Petitioner raised six claims for relief, asserting Claims 1-2 and 7-10 here. (ECF No. 38-2, Lodgment No. 2.) On July 20, 2017, the California Court of Appeal affirmed the judgment in a reasoned opinion. (ECF No. 38-1, Lodgment No. 1.) Petitioner thereafter filed a petition for review in the California Supreme Court, which was denied in an October 25, 2017 order stating in full: "The petition for review is denied." (ECF Nos. 38-4, 38-5, Lodgment Nos. 4-5.) On March 5, 2018, Petitioner filed a habeas petition in the California Court of Appeal requesting early parole consideration and recalculation of custody credits, which on March 8, 2018, the state appellate court denied. (ECF Nos. 38-6, 38-7, Lodgment Nos. 6-7.)

On September 19, 2018, Petitioner filed a federal Petition, which on September 28, 2018, the Court dismissed for failure to satisfy the filing fee requirement and with a notice of options for failure to exhaust state court remedies. (ECF Nos. 1-2.) After granting

Petitioner's requests to proceed in forma pauperis and for an extension of time to choose one of the options outlined and file a response (see ECF No. 11), on July 11, 2019 and August 6, 2019, Petitioner filed motions for withdrawal and abeyance.  (ECF Nos. 12, 14.)  After briefing and the Magistrate Judge's issuance of a Report and Recommendation ("R&R") to grant Petitioner's unopposed motions for withdrawal and abeyance (see ECF Nos. 16-17), on February 10, 2020, the Court issued an order adopting the R&R, granting the unopposed motions for withdrawal and abeyance, dismissing the unexhausted claims (Claims 3-6) and staying the remainder of the federal Petition.  (ECF No. 18.)

In October 2019, Petitioner filed three sets of filings in the state superior court (see ECF Nos. 38-8 through 3-12, Lodgment Nos. 8-10), which that court construed together as a second state habeas petition raising six grounds for relief, Claims 1-6 here.  (See ECF No. 38-13, Lodgment No. 11.)  On January 6, 2020, the state superior court denied the petition, finding Claims 1 and 2 procedurally barred because they were previously raised and rejected on appeal, Claims 3-5 procedurally barred due to substantial delay, and concluding all six claims failed to state a prima facie case for relief.  (Id.)  On December 27, 2019, Petitioner filed a third habeas petition in the state superior court (ECF No. 38-15, 38-16, Lodgment No. 13), which on January 28, 2020, the superior court denied on the same grounds as the second petition, noting it appeared to be a photocopy of the second petition.  (ECF Nos. 38-14, 38-17, Lodgment Nos. 12, 14.)[1]

On April 7, 2020, Petitioner filed a habeas petition in the California Court of Appeal, raising Claims 1-6.  (See ECF No. 38-18, Lodgment No. 15.)  In an order dated April 10, 2020, the state appellate court denied the petition, finding the petition barred as untimely, concluding several claims were additionally barred pursuant to other state procedural bars or for failure to state a prima facie case for relief, discussed in greater detail with respect to Claims 3-6 below, and stating: "Where, as here, the claims are procedurally barred or

---

[1] The state record portions lodged by Respondent appears to contain two identical copies of the state superior court's January 28, 2020 order denying the third state habeas petition.

fail to state a prima facie case for relief, the court will summarily deny the petition."  (ECF No. 38-19 at 2, Lodgment No. 16.) (citations omitted.)

On April 13, 2020, Petitioner filed a petition in the California Supreme Court, raising Claims 3-6.  (ECF No. 38-20, Lodgment No. 17.)  On July 8, 2020, the California Supreme Court denied the petition in an order that stated in full: "The petition for review is denied." (ECF No. 38-21, Lodgment No. 18.)

On September 3, 2020, Petitioner filed a Petition to Proceed with Federal Review (ECF No. 26) and an Amended Petition (ECF No. 27), the latter of which is the operative petition in the instant federal action.  On September 28, 2020, the Court issued an order lifting the stay and setting a briefing schedule.  (ECF No. 30.)  On January 14, 2021, Respondent filed an Answer and lodged the state court record (ECF Nos. 37-38) and on February 16, 2021, Petitioner filed a Traverse.  (ECF No. 44.)

## II.   FACTUAL BACKGROUND

The following facts are taken from the state appellate court opinion affirming Petitioner's judgment in People v. Jones, D070280 (Cal. Ct. App. July 20, 2017).  (See ECF No. 38, Lodgment No. 1.)   The state court factual findings are presumptively reasonable and entitled to deference in these proceedings.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

> On an afternoon in June 2015, transit system security guard Matthew Martin was working at a trolley station in downtown San Diego. Martin saw Thomas S. who appeared to be intoxicated. After Thomas stumbled and fell, Martin helped him up and onto a cement bench. Thomas stood up and then fell against the bench. Martin had difficulty controlling Thomas because Thomas kept trying to get up and walk away. Martin had to keep pushing Thomas back onto the bench.

> At that point, Jones approached the men in a polite manner with his hands up, saying he was there to help. Jones kneeled next to Thomas, attempting to calm him and have him wait for paramedics. Other transit security guards arrived, including Alberto Perezdeleon, Angel Garcia and James Scherer. Garcia switched on his body camera when he arrived at the scene. Martin and Perezdeleon asked Jones to step away, but Jones refused.

Jones stated he would leave when paramedics arrived because Thomas needed medical attention, not law enforcement.

Firefighters Benjamin Vernon, Alexander Wallbrett, Charles West, and Fire Captain Steven Michaels responded to a medical call to assist Thomas. Martin testified that the firefighters took over the scene when they arrived. Vernon and Wallbrett tried to determine whether Thomas was intoxicated or had an underlying medical condition.

Wallbrett asked Jones what was happening. Jones said he was helping, but was not with Thomas. Jones then complied with Wallbrett's request to step back. Vernon asked if Jones knew Thomas, and Jones said no. Jones walked away after Vernon thanked him for his assistance. Michaels summoned Jones, learned that Jones was not Thomas's friend and started to believe Jones might be a problem because he did not know anything about Thomas. Michaels asked Jones to step back several times, but Jones ignored him and continued talking. Jones told Michaels, "I'm not intimidated by you." During this same time, Thomas was creating a disturbance by being loud and insisting that he be allowed to stand up.

Feeling that Jones was getting aggressive, Michaels loudly commanded Jones to get back and then deliberately pushed Jones to get him away, causing Jones to fall backward over a bench. Jones got up, attacked Perezdeleon, and the men started fighting. Perezdeleon bear-hugged Jones and tossed him over the railing to get Jones away from other people. Perezdeleon positioned himself by the railing to prevent Jones from coming back, but Jones "bull-rushed" him. Martin then joined the struggle to assist Perezdeleon with Jones. In the meantime, Vernon jumped over the rail to help Perezdeleon. Perezdeleon and Martin retreated. They and Garcia deployed their pepper spray, hitting Jones directly in the face.

Vernon, who was wearing his firefighter uniform and blue medical gloves, tried to diffuse the situation. Vernon turned toward Jones, who was about six to eight feet away, with his hands up and palms extended, telling Jones to calm down and asking him, "What's wrong?" As Vernon continued to try to calm Jones, Jones pulled out a knife. Jones ran at Vernon and said, "What's up, motherfucker." Vernon, with his hands still in the air, said, "Wait, wait." Jones stabbed Vernon in his lower back and then in the chest, puncturing Vernon's lung and breaking a rib. Jones also tried to stab Vernon in the head, but missed.

West grabbed Vernon and threw him to the side as Wallbrett, who was also wearing his firefighter uniform, jumped over the railing and grabbed Jones to prevent Jones from hurting anyone else. Jones stabbed Wallbrett three times, twice in the shoulder and once in the back. West grabbed Jones's wrist to prevent him from stabbing Wallbrett again. Security guards then jumped in to restrain Jones, as Jones shouted "I'll kill you all."

Videos of the incident were played for the jury, one from Garcia's body camera in real time and in slow motion, and one from a stationary camera at the trolley station.

(ECF No. 38-1 at 2-4.)

## III.   **PETITIONER'S CLAIMS**

(1) The trial court violated Petitioner's right to due process and a fair trial in admitting propensity evidence concerning Petitioner's 2008 conviction of battery of a peace officer. (ECF No. 27 at 6-11.)

(2) The trial court violated Petitioner's rights to due process and a fair trial in admitting into evidence photographs of the officer concerning the 2008 conviction. (Id. at 12-16.)

(3) Petitioner's rights to a fair and unbiased jury and due process were violated due to the presence of a juror who previously dated the trial judge. (Id. at 17-26.)

(4) Judicial bias rendered Petitioner's trial fundamentally unfair and violated due process. (Id. at 27-48.)

(5) Petitioner was denied due process due to the prosecutor suborning false and perjured testimony by Captain Michaels. (Id. at 49-52.)

(6) Petitioner's rights to due process and a fair trial were violated by the ineffective assistance of trial counsel in failing to challenge a biased juror and calling witnesses who opened the door to the admission of propensity evidence. (Id. at 53-60.)

(7) Trial court error in instructing with CALCRIM 3471 violated Petitioner's rights to due process and a fair trial. (Id. at 61-71.)

(8) Due process requires reversal because the prosecution's evidence was insufficient to prove Petitioner did not act in self-defense. (Id. at 72-81.)

(9) The cumulative effect of errors violated Petitioner's due process rights.  (Id. at 82-91.)

(10) Instructional error in defining a firefighter's duty violated Petitioner's rights to due process and a fair trial.  (Id. at 92-94.)

## IV.   STANDARD OF REVIEW

A state prisoner isn't entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless it: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Harrington v. Richter, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).  Moreover, even if § 2254(d) is satisfied or does not apply, a reviewing habeas court must still determine whether the petitioner has established a federal constitutional violation.  See Fry v. Pliler, 551 U.S. 112, 119 (2007) (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."); see also Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 413 (2000).  A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."  Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).  With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410.  "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption

by 'clear and convincing evidence.'" <u>Rice v. Collins</u>, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Richter</u>, 562 U.S. at 101, quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Richter</u>, 562 U.S. at 102.

In situations where the state court failed to reach the merit of a claim or the standard of review applying to a claim is unclear, de novo review is appropriate. <u>See</u> <u>e.g.</u> <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo."); <u>see</u> <u>also</u> <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).") The reasoning of the state court remains relevant to a habeas court's determination of whether federal constitutional error occurred under even a de novo review. <u>See</u> <u>Frantz</u>, 533 F.3d at 738-39.

In a federal habeas action, "[t]he petitioner carries the burden of proof." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011), citing <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam). However, "[p]risoner pro se pleadings are given the benefit of liberal construction." <u>Porter v. Ollison</u>, 620 F.3d 952, 958 (9th Cir. 2010), citing <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam).

///

///

# V.    DISCUSSION

Respondent maintains habeas relief is unavailable and Petitioner is not entitled to an evidentiary hearing on his claims because: (1) Claims 3 through 6 are procedurally defaulted, (2) Claim 9 is unexhausted and (3) in any event, the state court adjudication of each of Petitioner's claims on the merits is neither contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts.  (ECF No. 37 at 2.)  In addition to addressing procedural default, exhaustion, the merits of his claims and reasserting a request for appointment of counsel and evidentiary development, Petitioner's Traverse also includes an attached request for discovery and a request for appointment of counsel.  (ECF No. 44 at 1-36.)

For the reasons set forth below, federal habeas relief is unavailable because any error arising from Claims 1 and 2 did not rise to the level of a due process violation and is clearly harmless even in the event AEDPA deference does not apply to those claims, Claims 3-6 and 9 fail on the merits under a de novo review irrespective of the outcome of any procedural default and/or exhaustion analysis, and the state court adjudication of Claims 7-8 and 10 is neither contrary to nor an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts.

## A.    Procedural Issues

### 1.    Procedural Default

A federal claim is procedurally defaulted when the state court's rejection "rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  "State rules count as 'adequate' if they are 'firmly established and regularly followed.'"  Johnson v. Lee, 578 U.S. ___, 136 S.Ct. 1802, 1804 (2016) (per curiam), quoting Walker v. Martin, 562 U.S. 307, 316 (2011).  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  La Crosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001), citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983) and Harris v. Reed, 489 U.S. 255, 265 (1989).

18cv2173 LAB (DEB)

1    Respondent contends Claims 3-6 are defaulted, stating: "The last reasoned state
2 judgment on grounds (3) through (6) was the Court of Appeal's order denying relief, as the
3 California Supreme Court summarily denied review" and "[t]he court of appeal ruled
4 Jones's petition was barred as untimely and that relief on grounds (3) through (5) was
5 barred for the additional reason that these claims could have been, but were not, raised on
6 direct appeal." (ECF No. 37-2 at 12-13) (citations omitted.)  Respondent asserts both state
7 procedural bars are independent and adequate to bar relief in federal court.  (Id.)

8    Petitioner filed a habeas petition in the California Court of Appeal, raising Claims
9 1-6.  (ECF No. 38-18.)  The state appellate court concluded in relevant part: "His petition,
10 filed four years after he was convicted, is barred as untimely," that "[t]he claims alleging
11 trial court bias, juror bias, and subornation of perjury by the prosecutor [Claims 3-5 here]
12 are barred on the additional ground that they could have been, but were not, raised on
13 appeal," and "the claim alleging ineffective assistance of counsel [Claim 6] not only is
14 barred as untimely but also fails to state a prima facie case because it does not adequately
15 plead the required element of prejudice."  (ECF No. 38-19 at 2) (citations omitted.)  The
16 state appellate court also held: "This court ruled on appeal the admission of the propensity
17 evidence [Claims 1 and 2] was not prejudicial; and Jones has submitted no declarations,
18 trial transcripts or other documents to substantiate his claim the juror's dates with the trial
19 judge deprived him of a fair trial [Claim 3].  Where, as here, the claims are procedurally
20 barred or fail to state a prima facie case for relief, the court will summarily deny the
21 petition."[2]  (Id.) (citations omitted.)  Thereafter, the California Supreme Court denied the
22 petition filed in that court in an order that stated in full: "The petition for review is denied."
23 (ECF No. 38-21.)

24
25
26 [2] Claims 1 and 2 were also denied as having been previously raised and rejected on appeal,
with a citation to In re Waltreus, 62 Cal. 2d 618 (1965).  (Id. at 2.)  Such citation does not
27 preclude federal review.  See Hill v. Roe, 321 F.3d 787, 789 (9th Cir. 2003) ("The
California Supreme Court's reliance on In re Waltreus does not, however, bar federal court
28 review."), citing Ylst v. Nunnemaker, 501 U.S. 797, 805 (1991).

18cv2173 LAB (DEB)

The Supreme Court and Ninth Circuit have found both California's timeliness procedural bar and the Dixon procedural bar, the latter of which bars claims that could have been but were not previously raised on appeal, adequate to bar federal review.  See Walker v. Martin, 562 U.S. 307, 312-21 (holding California's timeliness requirement, that a petitioner "must seek habeas relief 'without substantial delay, . . . as 'measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim,'" is firmly established and consistently applied) (internal citations omitted); see also Lee, 136 S.Ct. at 1806 (California's Dixon bar "qualifies as adequate to bar federal habeas review."); Johnson v. Montgomery, 899 F.3d 1052, 1060 (9th Cir. 2018) ("The United States Supreme Court held that California's Dixon rule is an adequate state ground to bar federal habeas review of a petitioner's claim."), citing Lee, 136 S.Ct. at 1804.

Both state procedural bars are also independent of federal law, as they were applied well after the California Supreme Court's decision in In re Robbins, 18 Cal. 4th 770 (1998), after which the state supreme court indicated federal law would no longer be considered in its application of state procedural bars.  See e.g. Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) ("The California Supreme Court has adopted in Robbins a stance from which it will now decline to consider federal law when deciding whether claims are procedurally defaulted."), citing Robbins, 18 Cal. 4th at 811-812.

The Supreme Court has further held: "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  Petitioner asserts he has cause for any procedural default of Claims 3-6, citing the ineffective assistance of prior appellate counsel, his prior lack of access to transcripts concerning the defaulted claims, and his pro se status on habeas review; Petitioner additionally appears to assert a fundamental

miscarriage of justice would occur without hearing his claims due to actual innocence.[3] (ECF No. 44 at 2-5.)

The Court finds addressing the merits to be the more efficient course of action because Claims 3-6 each fail on the merits under even a de novo review and Petitioner would not be entitled to habeas relief regardless of the outcome of a procedural default analysis.  See e.g. Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be."); see also Thompkins, 560 U.S. at 390 ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a)."); see also Clabourne v. Ryan, 745 F.3d 362, 382 (9th Cir. 2014) ("Though Martinez now opens a new path to excusing the procedural default, we address the [] claim ourselves here because it is clear that the claim fails."), citing Sexton v. Cozner, 679 F.3d 1150, 1159 (9th Cir. 2012), overruled on other grounds by McKinney v. Ryan, 813 F.3d 798 (9th Cir. 2015). Here, it is evident a determination of whether Petitioner can satisfy cause and prejudice or demonstrate a fundamental miscarriage of justice would occur were the Court to refrain

---

[3] The prospect of conducting a procedural default analysis on Claim 6, asserting ineffective assistance of trial counsel, could be further complicated by Martinez v. Ryan, 566 U.S. 1 (2012), in which the Supreme Court held that in certain situations, the ineffective assistance of state collateral review counsel or lack of such counsel could serve as "cause" to excuse a procedural default of an ineffective assistance of trial counsel claim, stating: "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." Id. at 17.

from hearing his claims on the merits could prove lengthy and complicated and it is far more efficient to resolve Claims 3 through 6 on the merits under a de novo review.

### 2. <u>Exhaustion</u>

"[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971); <u>see also</u> 28 U.S.C. §§ 2254(b) and 2254(c). "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." <u>Picard</u>, 404 U.S. at 275. "In order to 'fairly present' an issue to a state court, a petitioner must 'present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'" <u>Gulbrandson v. Ryan</u>, 738 F.3d 976, 992 (9th Cir. 2013), quoting <u>Scott v. Schriro</u>, 567 F.3d 573, 582 (9th Cir. 2009). To exhaust, the highest state court, here the California Supreme Court, must be provided an opportunity to rule on the merits of all claims to be brought in federal court. <u>See</u> <u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982); <u>see also</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.")

Respondent asserts Claim 9 alleging cumulative error is unexhausted, noting Petitioner "raised a cumulative error claim on direct appeal but that claim did not include the alleged errors in grounds (3) through (6)," but argues this claim can be denied as plainly meritless. (ECF No. 37-2 at 34.) Petitioner raised a claim of cumulative error on direct appeal, but the allegations presented in Claims 3-6 were not included in the cumulative error claim Petitioner previously raised on direct appeal, as those allegations were first raised in later state habeas proceedings; Petitioner did not re-raise a cumulative error claim in those state habeas proceedings. (<u>See</u> <u>e.g.</u> ECF Nos. 38-18, 38-20.) Despite Petitioner's failure to present Claim 9 to the state supreme court as currently constituted and including the allegations outlined in Claims 3-6, Claim 9 may nonetheless be "technically exhausted" if Petitioner no longer has state court remedies available to him. <u>See</u> <u>Cassett v. Stewart</u>,

406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."), quoting Coleman, 501 U.S. at 732.  Because it has been well over three years since Petitioner's judgment was affirmed and the events at issue (allegations of juror bias, judicial bias, prosecutor subornation of false and perjured testimony and ineffective assistance of trial counsel) occurred during and were known at the time of Petitioner's 2016 trial proceedings, it is clear Claim 9 would be untimely if Petitioner returned to the state supreme court now.  See Walker, 562 U.S. at 312-21.  Accordingly, Claim 9 is technically exhausted.

A technically exhausted claim is procedurally defaulted in federal court. O'Sullivan, 526 U.S. at 848; see also Cooper v. Neven, 641 F.3d 322, 328 (9th Cir. 2011) (recognizing "procedural default encompasses claims that were not presented in state court and would now be barred by state procedural rules from being presented at all," including "any unexhausted claims that would be considered untimely if [petitioner] attempted to exhaust them now," and noting that type of claim is "technically exhausted but procedurally defaulted"), citing Beaty v. Stewart, 303 F.3d 975, 987 (9th Cir. 2002) and Coleman, 501 U.S. at 732.  Again, federal review of a procedurally defaulted claim is ordinarily barred unless a petitioner can show cause and prejudice or demonstrate a fundamental miscarriage of justice will occur in the event the federal court does not consider his claim.  See Coleman, 501 U.S. at 750.  Yet, for the same reasons previously discussed with respect to Claims 3-6, addressing the merits clearly appears the more efficient course of action because Claim 9 fails under even a de novo review.  See Franklin, 290 F.3d at 1232, citing Lambrix, 520 U.S. at 525; see also Thompkins, 560 U.S. at 390.

Even to the extent Claim 9 remains unexhausted and while habeas relief may not be granted on an unexhausted claim, the Court may also exercise discretion to deny an unexhausted claim on the merits.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Gatlin v. Madding, 189 F.3d

882, 889 (9th Cir. 1999); see also Cassett, 406 F.3d at 624 ("[A] federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.")

### B.   Merits

#### 1.   Claims 1 and 2

In Claim 1, Petitioner contends the trial court erred in admitting evidence of Petitioner's 2008 conviction for battery on a peace officer and in Claim 2 contends the trial court erred in admitting photos of that officer's injuries, violating his federal constitutional rights to due process, a fair trial, and a fair and unbiased jury.  (ECF No. 27 at 6-16.) Respondent maintains the state appellate court's conclusion, that the trial court's error in admitting the evidence did not render Petitioner's trial fundamentally unfair, was reasonable.  (ECF No. 37-2 at 14-15.)

Petitioner raised Claims 1 and 2 in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning.  (See ECF Nos. 38-4, 38-5.)  The United States Supreme Court has repeatedly stated that a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst, 501 U.S. at 803; see also Wilson v. Sellers, 584 U.S. ___, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.")  As such, in the absence of record evidence or argument seeking to rebut this presumption, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claims 1 and 2.  See Ylst, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them no effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).

After discussing the factual details concerning the prior conviction and incidents themselves, which included Petitioner's 2008 felony conviction for battery on a police

officer causing injury against BART Officer Pirone and Captain Michaels' 2006 and 2015 arrests for domestic incidents against his wife and girlfriend, respectively (see ECF No. 38-1 at 9), the state appellate court discussed the trial court's rulings, as follows:

> The prosecution moved in limine to admit evidence of the conduct underlying Jones's 2008 conviction under section 1101, subdivision (b) (section 1101(b)), to establish intent, motive, common plan, absence of mistake, and state of mind. Alternatively, the prosecution requested admission of this evidence under section 1103, subdivision (b) (section 1103(b)), if Jones presented similar evidence under section 1103, subdivision (a) (section 1103(a)).
>
> The court concluded that Jones's 2008 conviction was inadmissible propensity evidence under section 1101(b). It ruled, however, that the 2008 conviction was admissible for impeachment and denied defense counsel's request to sanitize the evidence.  The trial court also held that if defense counsel desired to introduce evidence of Michaels's prior violent actions against his wife and girlfriend under section 1103(a), then the door would be opened for the prosecution to admit evidence of Jones's conduct against Pirone under section 1103(b).
>
> Shortly before trial, defense counsel notified the prosecution that he intended to introduce evidence of Michaels's prior conduct toward his wife and girlfriend under section 1103(a). Defense counsel also objected to the admission of four photographs depicting the injuries Pirone suffered in 2008. The trial court found the photographs relevant and not subject to exclusion under section 352.
>
> During cross-examination of Michaels, defense counsel introduced evidence of Michaels's 2006 incident involving his then-wife and his 2015 incident involving his girlfriend under section 1101(a). Consequently, the prosecution introduced evidence of Jones's 2008 conviction as well as four photographs of Pirone's injuries under section 1103(b).

(Id. at 10-11.)  After outlining sections 1101 and 1103 (which are also discussed as applied below), the state appellate discussed the contentions at issue, as follows:

> Jones contends the trial court erred by admitting evidence of his prior assault conviction against Pirone.  He argues this evidence was unduly prejudicial and created the risk that the jury would improperly use it as propensity evidence against him. Even assuming the prior conviction was admissible for impeachment purposes, he asserts the evidence should have

17

been sanitized so the jury would not know it was for battery on a peace officer. Jones also contends the trial court erred in admitting four inflammatory photographs of Pirone's injuries.[3] The People assert any error was invited for tactical reasons and harmless.

> [FN3] Jones contends admission of propensity evidence rendered his trial fundamentally unfair, thereby violating his right to due process and equal protection. He raises the issue without argument to preserve it for federal review. Jones's federal claim is so noted, and we need not address the issue.

Subject to section 352, a witness in a criminal trial may be impeached with "any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty." (*Castro*, *supra*, 38 Cal.3d at p. 306; *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1400.) Battery on a peace officer is a crime of moral turpitude. (*People v. Lindsay* (1989) 209 Cal.App.3d 849, 857.) Accordingly, the trial court had discretion to permit evidence of Jones's 2008 conviction to be used for impeachment purposes. (§ 788; *People v. Harris* (2005) 37 Cal.4th 310, 337.) The question presented is whether the trial court abused its discretion by not excluding Jones's 2008 conviction under section 352 because the similarity between the charged offenses and the prior conviction was likely to create undue prejudice.

In exercising its discretion, the trial court is guided but not bound by the following factors: (1) the relationship between the offense underlying the prior conviction and the credibility of the witness; (2) whether the prior felony is near or remote in time; (3) the similarity of the prior felony conviction to the current charged offense; and, when applicable, (4) what effect a decision not to testify may have on the defense. (*People v. Clair* (1992) 2 Cal.4th 629, 654; *Beagle*, *supra*, 6 Cal.3d at p. 453.) A trial court's discretion to admit or exclude prior convictions is broad "'and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded.'" (*People v. Hinton* (2006) 37 Cal.4th 839, 887.)

Here, the trial court cited the four *Beagle* factors, expressly noting that "same or similar cases should be admitted sparingly." The trial court found that the 2008 conviction was not remote in time, involved moral turpitude and concluded that admission of the evidence was not prejudicial under section 352. We note that the court's admission of Jones's 2008 conviction did not prevent Jones from testifying. We find nothing arbitrary, capricious, or absurd about the trial court's decision to admit the proffered impeachment evidence.

///

18cv2173 LAB (DEB)

In declining to sanitize the prior conviction, the trial court stated that courts "are not allowed to sanitize" prior convictions, citing *People v. Barrick* (1982) 33 Cal.3d 115 (*Barrick*) and *People v. Rollo* (1977) 20 Cal.3d 109 (*Rollo*), superseded by constitutional amendment as held in *Castro*, *supra*, 38 Cal.3d at pp. 308-309, 312. In both cases, the trial court allowed evidence of a sanitized prior conviction. (*Barrick*, at p. 122; *Rollo*, at p. 115.) In both cases, our high court held that at the prejudicial effect of the "sanitized" prior conviction outweighed its probative value as the generic reference left the jury speculating regarding the nature of the prior conviction. (See *Barrick*, at p. 130; *Rollo*, at p. 120.) As our Supreme Court has recognized, sanitization presents a defendant with the "archetypal Hobson's choice of (1) remaining silent on the point and subjecting himself to...improper speculation by the jury, or (2) divulging the nature of his prior conviction and incurring an equally grave risk that the jury will draw an impermissible inference of guilt. Either way leads to prejudice(.)" (*Rollo*, at p. 120.)

The passage of Proposition 8 altered the law to add the following provision to the California Constitution: "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment ...." (Cal. Const., art I, § 28, subd. (f)(4); *Castro*, *supra*, 38 Cal.3d at p. 312.) Thus, after the passage of Proposition 8 there is no longer an inflexible rule requiring exclusion of past offenses similar or identical to the offense on trial. (*People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590.) Rather, the fact the prior conviction is identical to the charged offense does not automatically require its exclusion for impeachment as the nature of the offense is "'just one fact to be considered by the trial court in exercising its discretion.'" (*People v. Green* (1995) 34 Cal.App.4th 165, 183.) Accordingly, after the passage of Proposition 8, courts may again sanitize prior convictions when exercising discretion to admit such evidence for impeachment. (*People v. Valentine* (1986) 42 Cal.3d 170, 182, fn. 8.)

Jones contends the trial court's misunderstanding of the law and failure to exercise its discretion to consider sanitizing his prior conviction denied him a fair hearing, requiring reversal. Here, the trial court appeared to hold that sanitizing a prior conviction is "not allowed." However, the trial court then cited Proposition 8 and *Castro* before exercising its discretion to admit the 2008 conviction without sanitizing it. As we mentioned, Proposition 8 abrogated the absolute rule requiring exclusion of a prior conviction that is identical to the charged offense and the *Castro* court recognizing that courts retain discretion regarding the admission of such evidence. (*Castro*, *supra*, 38 Cal.3d at p. 312.) Additionally, Jones's trial brief informed the court that

Proposition 8 eliminated restrictions on impeachment with prior convictions and requested that if the trial court deemed his prior felony convictions to be admissible, that they be sanitized.  Thus, the trial court knew about the change in the law and knew it had discretion to sanitize the 2008 conviction by allowing it be referred to only as a prior felony, but impliedly declined to do so.  (*People v. Sandoval* (1992) 4 Cal.4th 155, 178; § 664 ("It is presumed that official duty has been regularly performed."); *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549-550 (a trial court is presumed to have been aware of and followed the applicable law).)[4]

> [FN4] Our reading of the reporter's transcript suggests the trial court intended to state that, in the past under *Barrick* and *Rollo*, a prior conviction that is identical to the charged offense must be excluded and cannot simply be sanitized.  Instead, the court misspoke when it stated that sanitizing a prior conviction is not allowed.  This statement suggested that the trial court did not know about the change in the law and erroneously believed that sanitizing a prior conviction was not allowed under current law.  A complete reading of the record shows the trial court understood the law in this area.

Accordingly, the question before us is whether the trial court abused its discretion in failing to sanitize the 2008 conviction.  On this record, we agree with Jones that the trial court erred in failing to sanitize the 2008 conviction because it amounted to improper propensity evidence.  Significantly, the trial court properly denied the prosecutor's request to admit the 2008 conviction under section 1101 finding it amounted to inadmissible propensity evidence that did not fall within an exception of section 1101, subdivision (b) showing. The 2008 conviction for battery on a peace officer was the same as two of the charges Jones faced in this case.  Based on this finding, when admitting the 2008 conviction for impeachment, the trial court should have sanitized the conviction to state it was a felony conviction for battery.

In any event, the court's error in failing to sanitize the 2008 conviction amounts to the erroneous admission of evidence which is state law error subject to the *Watson* test. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Partida* (2005) 37 Cal.4th 428, 439 ("Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional Watson test."); *People v. Forster* (1985) 169 Cal.App.3d 519, 525-526 (improper admission of prior felony conviction subject to harmless error rule).) That test asks whether it is reasonably probable the defendant would have obtained a more favorable verdict if the improper evidence had not been admitted. (*Watson*, at p. 836.) We conclude the error was harmless in that it is

not reasonably probable that had the error not occurred a more favorable result would have ensued in light of the overwhelming evidence of Jones's guilt. (§ 353; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018-1019.) The seminal question before the jury was whether Jones stabbed Vernon and Wallbrett in self-defense.  On this point, the jury heard witness testimony, Jones's testimony and viewed videos of the incident.  Defense counsel argued during closing argument that Michaels shoved Jones into a situation where he had to defend himself, Jones had been attacked first and it was six against one. Defense counsel also argued that the 2008 incident left Jones fearful of security guards.

The trial court properly instructed the jury that the People had the burden of proving beyond a reasonable doubt that Jones did not act in lawful self-defense.  (CALCRIM No. 3470.)  Defense counsel reminded the jury of this point during closing argument.  Here, the jury necessarily concluded that the prosecution had met its burden of showing Jones did not act in self-defense.  As we addressed above, ample evidence supported this conclusion. (*Ante*, pt. I.B.)  Any error in admitting the 2008 conviction was not reversibly prejudicial, as it is not reasonably probable that a result more favorable to Jones would have been reached in the absence of the error. (*People v. Scheer*, *supra*, 68 Cal.App.4th at pp. 1018-1019.)

Jones argues the trial court erred in admitting his 2008 conviction under section 1103. He also contends the trial court erred in admitting four inflammatory photographs of Pirone's injuries which led to his 2008 conviction.

The trial court held that if defense counsel desired to introduce evidence of Michaels's prior violent actions against his wife and girlfriend under section 1103(a), then the door would be opened for the prosecution to admit evidence of Jones's conduct under section 1103(b).  Under section 1103, a defendant prosecuted for an assaultive offense, and who asserts self-defense, may introduce evidence of specific violent acts by the victim on a third person to show that the victim has a violent character and was the aggressor in the current offense. (*Wright*, *supra*, 39 Cal.3d at p. 587.)  Here, section 1103(a) does not apply because Michaels was not a victim.  Because Michaels was not a victim, evidence of Jones's violent character was not admissible under section 1103(b).

As a preliminary matter, the trial court's erroneous analysis regarding admission of the 2008 conviction under section 1103 does not detract from its proper admission of this evidence for impeachment.  With this said, the trial court's erroneous analysis under section 1103 led to the improper admission

of details of Jones's 2008 conviction, including the four photographs of Pirone's injuries, to show Jones's character for violence under section 1103(b).[5] Although the trial court erred in admitting the photographs, as discussed above, any error was harmless as it is not reasonably probable that had the error not occurred a more favorable result would have ensued in light of the overwhelming evidence of Jones's guilt. (§ 353.) Moreover, the details of Jones's 2008 conviction and the injuries suffered by Pirone were less inflammatory than the charged offenses.

> [FN5] When a witness is impeached with a prior felony conviction, the scope of inquiry does not extend to the facts underlying the offense. (*People v. Casares* (2016) 62 Cal.4th 808, 830.) The trial court recognized this rule, describing how to impeach, "All you do is, 'Mr. Jones, on such and such a date, were you convicted of a violation of Penal Code 211, robbery?' If he says 'no,' then we'll talk because you can prove by other means. If he says "yes,' you move on. We don't get into any of the facts, anything like that. It's just that simple."

(ECF No. 38-1 at 13-20.)

Petitioner first contends "[t]he admitted error was ruled harmless in a state appeal court yet under the 'Watsons test' that the state used there was no actual fact finding process to conclude that the error was 'harmless to the federal Chapman' standard" and asserts this Court should conduct de novo review. (ECF No. 27 at 6, 15.) Respondent acknowledges the state appellate court recognized Petitioner's federal due process claim and stated "it 'need not address the issue'" yet nonetheless maintains "[w]hile the court did not specifically address the due process issue, in applying the *Watson* standard the court necessarily found no due process violation" given the state court's citation to <u>People v. Patrida</u>, 37 Cal. 4th 428, 439 (2005) and that decision's reference to "fundamental unfairness." (ECF No. 37-2 at 16 n.2, quoting ECF No. 38-1 at 13 n.3.)

Because the California Court of Appeal appears to have analyzed Petitioner's Claim 1 and 2 contentions for error only under state law, the Court must first decide whether the state court also adjudicated the federal aspects of those claims on the merits to determine whether AEDPA deference applies. <u>See</u> <u>Richter</u>, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed

that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); see also Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.")

Here, the state appellate court concluded error had occurred but evaluated the harmlessness of that error solely under Watson, which holds "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." People v. Watson, 46 Cal. 2d 818, 836 (1956). In state court, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24 (1967). The Ninth Circuit has distinguished the two standards, stating: "The Watson standard is used to review non-constitutional, trial type errors," while "[i]n contrast, the more stringent standard, under Chapman v. California, is used to review errors of constitutional magnitude." Hall v. Haws, 861 F.3d 977, 989 n.7 (9th Cir. 2017).

It appears the state appellate court elected not to address the federal aspect of Claims 1 and 2, because while the state court specifically recognized "Jones contends admission of propensity evidence rendered his trial fundamentally unfair, thereby violating his right to due process and equal protection" and Petitioner "raises the issue without argument to preserve it for federal review," the state appellate court indicated it would refrain from addressing the federal claim, stating: "Jones's federal claim is so noted, and we need not address the issue." (ECF No. 38-1 at 13 n. 3.) Yet, as Respondent aptly points out, the state court also expressly concluded the error asserted in Claims 1 and 2 was state law error subject to Watson rather than error of federal dimension. (See ECF No. 37-2 at 16, citing ECF No. 38-1 at 17, citing Partida, 37 Cal. 4th at 439 ("Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional Watson test.")

Because the state court indicated it "need not" address the federal aspect of these claims, yet also appeared to conclude the error asserted was amenable to a state law rather than federal analysis, it is unclear whether the <u>Williams</u> presumption applies or has been rebutted.  However, regardless of whether AEDPA deference applies to Claims 1 and 2, to merit habeas relief Petitioner must in any event also show that the claimed errors had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993); <u>see</u> <u>Fry</u>, 551 U.S. at 119 (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."); <u>see</u> <u>also</u> <u>Frantz</u>, 533 F.3d at 735-36.  For the reasons discussed below, because Petitioner fails to persuasively show any reasonable likelihood of a different outcome under <u>Brecht</u>, as it is evident the jury's verdict would not have been different in the absence of the contested propensity evidence, Claims 1 and 2 do not merit federal habeas relief regardless of whether the <u>Williams</u> presumption applies or has been rebutted.

In the event the presumption applies and even assuming without deciding the trial court erred under state law in failing to sanitize and admitting details concerning Petitioner's 2008 conviction and photographs of Officer Pirone's injuries, to merit habeas relief Petitioner must still demonstrate the asserted error violated his due process rights.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)  ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); <u>see</u> <u>also</u> <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991) ("The issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point."); <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 897 (9th Cir. 1996) ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'"), quoting <u>Kealohapauole v. Shimoda</u>, 800 F.2d 1463, 1465 (9th Cir. 1986).

First, at a minimum, Petitioner's 2008 conviction was admissible as impeachment and the jury was properly instructed that certain evidence was admitted for limited purposes, could be considered for such purposes, and that a prior felony conviction was among the factors a jury could consider in evaluating a witness' credibility.  (See CT 677, CALCRIM 303) ("During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."); (see also e.g. CT 671-72, CALCRIM 226) (jury instruction on evaluating testimony of witnesses, including credibility and believability); (see also CT 678, CALCRIM 316) (instructing in relevant part, "If you find that a witness has been convicted of a felony, you may consider that fact in evaluating the credibility of the witness's testimony.  The fact of a conviction does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable.")  As such, the jury was properly allowed to consider the prior conviction in evaluating Petitioner's credibility, given he testified at trial.  See Jammal, 926 F.2d at 920 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.")

The jury was also specifically instructed "[e]vidence for the character trait for violence of the defendant may be considered by you in determining whether or not the defendant was acting in conformity with that character trait on June 24, 2015."  (CT 684, CALCRIM 375.)  While concluding the introduction of the details concerning the 2008 conviction amounted to improper propensity evidence given the similarity of the prior conviction to several of the charged crimes, the state court found its admission harmless under state law.  (ECF No. 38-1 at 17.)  With respect to federal law, the Supreme Court has specifically declined to decide whether the admission of propensity evidence itself amounts to a due process violation.  See McGuire, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.")

On this record, the Court finds any error in the trial court's failure to properly sanitize Petitioner's 2008 felony conviction fails to rise to the level of a federal due process

violation and even in the event it does, any error was harmless.  The primary issue for the jury to decide at trial was whether the force Petitioner employed against the officers and firefighters was reasonable and done in self-defense.  While the introduction of details concerning Petitioner's prior conviction for battery of an officer allowed the jurors to consider Petitioner's character for violence, that same evidence was also utilized by the defense to bolster Petitioner's self-defense claim.

Petitioner testified the prior 2008 incident, in which he asserted Officer Pirone was the initial aggressor and pepper sprayed Petitioner without provocation and to which Petitioner pled guilty because he hit back when that officer hit him, "had a great impact on me," as he "had been basically beaten up by a police officer," and stated: "They're not supposed to do that.  And I just remember not being able to trust those guys." (Reporter's Tr. ["RT"] 944-45 [ECF No. 38, Lodgment No. 19].)  Petitioner indicated the incident impacted his attitude and actions in the instant case, noting he intervened when he saw transit officers pushing an individual to a sitting position while that person kept telling those officers to get their hands off and not to touch him, and stated: "I'm a little bit leery of law enforcement, let's put it like that, and trolley security." (RT 947.)  When officers ran at him, Petitioner found it reminiscent of the 2008 encounter, stating: "[T]hey just take it to the exact next level to where you're literally fighting for your life."  (RT 972.) Petitioner contended he pulled his knife to defend himself and explained: "I'm going to defend myself.  I'm going to do whatever I have to do.  I'm not going to be a statistic.  I'm not going to die today, and that's the attitude and approach I had on that day." (RT 976.)

Defense counsel similarly cited the 2008 incident in arguments to the jury, noting the transit officers' confrontation with the intoxicated man concerned Petitioner "[a]nd the reason why it became concerning are because of Mr. Jones's past experiences and past knowledge about transit security, about transit police and how a situation which starts as nothing could quickly escalate." (RT 1175.)  Counsel argued "that situation in 2008 where Mr. Jones himself ended up in the hospital, where he ended up bloody, has a lasting impact."  (RT 1176.)  Defense counsel contended when the transit officers ran towards

Petitioner, "knowing what he knows about his past experience from 2008 and seeing the security guards rush him with their hands on their belt, he thought these guys are here, in his own words, 'to fuck me up.'"  (RT 1182.)

Again, the jury was instructed the 2008 conviction could be considered for limited purposes, including Petitioner's credibility as a witness and whether his actions on the day of the instant crimes were in character, but only for those purposes. (See CT 677, CALCRIM 303) ("During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other.")  In addition to those instructions, the jurors were also instructed the prosecution bore the ultimate burden of proving Petitioner's guilt beyond a reasonable doubt.  (See CT 667, CALCRIM 220) ("In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.")  This included instructions that the prosecution also bore the burden of proving beyond a reasonable doubt Petitioner did not act in self-defense.  (See e.g. CT 689, CALCRIM 505) ("The People have the burden of proving beyond a reasonable doubt that the attempted killing was not justified. If the People have not met this burden, you must find the defendant not guilty of attempted murder or attempted voluntary manslaughter."); (CT 693, CALCRIM 604) ("The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense.  If the People have not met this burden, you must find the defendant not guilty of attempted murder."); (CT 706, CALCRIM 3470) ("The People have the burden of proving beyond a reasonable doubt that the defendant did not act in lawful self-defense.  If the People have not met this burden, you must find the defendant not guilty of counts Three, Four, Five and Six.")

Upon review of the details introduced concerning the conviction and their use at trial by not only the prosecution but also cited by the defense to bolster Petitioner's claim of self-defense, the Court isn't persuaded that the failure to sanitize the 2008 conviction

rendered Petitioner's trial fundamentally unfair in violation of due process.  See Ortiz-Sandoval v. Gomez, 81 F.3d at 897 ("While a petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he is entitled to relief if the evidentiary decision created an absence of fundamental fairness that 'fatally infected the trial.'"), quoting Kealohapauole, 800 F.2d at 1465; see also Jammal, 926 F.2d at 920 ("Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.")

Nor is the Court persuaded that the admission of photos concerning the 2008 incident that resulted in Petitioner's conviction for battery of an officer violated Petitioner's due process rights.  Upon review, the four photographs of Officer Pirone's injuries, which showed the officer's bruised and bloodied eye, while somewhat graphic, paled in comparison to the evidence concerning the instant incident.  Indeed, the surveillance video and still photos which reflected Petitioner stabbing two firefighters and the photos of the firefighters' resultant injuries were clearly more severe and inflammatory.

In view of the considerable evidence supporting the convictions as well as the jury instructions specifically requiring the prosecution to disprove self-defense and prove the elements of the charged crimes to reach the verdict rendered by the jury, the Court is not persuaded that the error in failing to sanitize Petitioner's 2008 conviction and admitting photos of the officer's injuries rose to the level of a constitutional violation, and even if it did, it didn't have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  Instead, considering the evidence and arguments presented in combination with the instructions provided to the jurors, any error was clearly harmless.  Habeas relief is not available on Claims 1 and 2.

## 2.   Claim 3

In this claim, Petitioner contends the presence of Juror #10 on the jury, who previously dated the trial judge, violated his federal constitutional rights to due process and to a fair and unbiased jury.  (ECF No. 27 at 17-26.)  Petitioner also asserts the state appellate court's denial of his request for appointment of counsel on habeas review violated his due

process rights.  (Id. at 23.)  As discussed above, the Court will conduct a de novo review of this claim.

Petitioner raised this claim in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning.  (See ECF Nos. 38-20, 38-21.)  The California Court of Appeal denied the habeas petition this claim was raised in as untimely, additionally denied this claim as barred because it could have been, but was not, raised on direct appeal, and stated in relevant part: "Jones has submitted no declarations, trial transcripts, or other documents to substantiate his claim the juror's dates with the trial judge deprived him of a fair trial." (ECF No. 38-19 at 2.)  In the absence of any attempt to rebut a presumption the state supreme court's silent denial rests on the same grounds as the state appellate court's reasoned decision, the Court will again "look through" the California Supreme Court's denial to the state appellate court opinion with respect to Claim 3.[4]  See Ylst, 501 U.S. at 803-04; see also Wilson, 138 S.Ct. at 1193; see also Frantz, 533 F.3d at 738-39 (reasoning of the state court is relevant

---

[4] Respondent cites not to the appellate court decision but to that of the superior court, stating: "The superior court rejected this claim on habeas corpus review, finding Jones failed to establish actual bias and that a prior dating relationship did not establish implied bias" and asserting "[b]ecause the superior court did not unreasonably apply Supreme Court precedent in reaching this conclusion, § 2254(d) bars relitigation." (ECF No. 37-2 at 20, citing Lodgment No. 11) (footnote omitted.)  Yet here, because the state appellate court did not issue an unexplained decision, the Court cannot "look through" this decision to the one issued by the superior court, but must instead "look[] through" the state supreme court's silent denial to the appellate court's decision.  Ylst, 501 U.S. at 804.  The Court declines Respondent's invitation to look to the superior court decision.  See Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005) ("AEDPA generally requires federal courts to review one state decision."), citing Williams, 529 U.S. at 395, 397-99.  With respect to Claims 4 and 5, Respondent again cites not to the state appellate court decision but to that of the state superior court.  (See ECF No. 37-2 at 22 (Claim 4), 23 (Claim 5), citing Lodgment No. 11 and ECF No. 27.)  Because the state appellate court didn't issue an unexplained decision as to Claims 4 and 5, the Court similarly declines Respondent's invitation to look to the superior court decision as to those claims.  See Ylst, 501 U.S. at 804; see also Barker, 423 F.3d at 1093, citing Williams, 529 U.S. at 395, 397-99.

to habeas court's determination of whether constitutional error occurred under even a de novo review).

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209, 217 (1982). "Voir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." McDonough Power Equipment Inc. v. Greenwood, 464 U.S. 548, 554 (1984). "[T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Id. at 556. The Ninth Circuit has also recognized two other types of juror bias apart from that discussed in McDonough, including "actual bias, which stems from a pre-set disposition not to decide an issue impartially," as well as "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).

In response to a portion of the juror questionnaire asking if the prospective juror was "personally acquainted with any judges, prosecuting attorneys, deputy district attorneys, or criminal defense attorneys" and asking for names, positions, and detail concerning the origin and extent of such acquaintance, Juror #10 checked "Yes" in response and indicated: "Judge-Jeff Fraser- I had a couple of dates with him," also replied: "David Rubin- his partner is a former client of mine" and added: "Might know some criminal attorneys from my line of work but none come to mind at this time." (Aug CT ["Augmented Clerk's Tr."] 152, ECF No. 38, Lodgment No. 21.) Juror #10 indicated she could be fair to both sides, didn't have any biases or prejudices that would affect the way she would decide the case,

1    and answered "No" to the question "Is there any reason you would not be a fair juror on
2    this case?"  (Aug CT 156-58.)

3         Upon review, the record offers no indication of <u>McDonough</u>-type bias, as Juror #10
4    revealed in her questionnaire both her prior acquaintance with the trial judge and that the
5    judge's partner was a former client.[5]  While Petitioner speculates the juror's acquaintance
6    with the trial judge may have been more extensive than indicated and may have continued
7    into the trial, Petitioner offers no record support for that assertion.  Petitioner also fails to
8    demonstrate a prior dating relationship with the trial judge, even had the juror failed to
9    disclose it, would have provided a basis for a challenge for cause.  <u>McDonough</u>, 464 U.S.
10   at 556 ("[T]o obtain a new trial in such a situation, a party must first demonstrate that a
11   juror failed to answer honestly a material question on voir dire, and then further show that
12   a correct response would have provided a valid basis for a challenge for cause.")

13        Nor is there any record support for a finding of actual bias.  Petitioner appears to
14   speculate as to the possibility that Juror #10's relationship with the trial judge continued
15   and amounted to actual bias.  (<u>See</u> ECF No. 27 at 22) ("[T]he state court never investigated
16   the claim as to whether the relationship was in fact concluded, actual bias of a jurist dating
17   the judge would obviously have been a violation of petitioner's rights to due process and
18   trial by an unbiased jury.")  However, the only evidence in the record is the juror's
19   questionnaire responses, which upon review reflected the juror's professed ability to be fair
20   and impartial and that she didn't harbor any biases or prejudices which would impact her
21   ability to decide the case fairly.  (<u>See</u> Aug CT 156-58.)
22   ///

23
24
         ─────────────────────
25   [5] Transcripts of the jury voir dire are not included in the reporter's transcripts lodged with
     the Court.  (<u>See</u> RT 405.)  The clerk's transcripts reflect both the prosecution and defense
26   conducted some voir dire of the prospective juror panel but fails to specifically mention
     the juror at issue; it appears only that Juror #10 (who was prospective juror #38, <u>see</u> ECF
27   No. 38-27 at 3), was not identified as one of the jurors individually questioned outside the
     presence of the other jurors.  (CT 798.)
28

Instead, Petitioner primarily appears to assert Juror #10 was impliedly biased.  (*See* ECF No. 27 at 19) ("Petitioner asserts that prejudice must sometimes be inferred through relationships; If a juror dated the defendant, prosecutor, defense attorney or Judge it would be implied bias."); (*see* also *id.* at 22) ("Implied bias of a jurist towards the state is a logical implication asserted by the petitioner at this time.")  However, as Respondent correctly notes, there is a lack of Supreme Court authority as to whether implied bias can provide a basis for federal habeas relief.  (*See* ECF No. 37-2 at 21, citing Hedlund v. Ryan, 854 F.3d 557, 575 (9th Cir. 2017) ("There is no clearly established federal law regarding the issue of implied bias. The Supreme Court has never explicitly adopted or rejected the doctrine of implied bias."), citing Fields v. Woodford, 309 F.3d 1095, 1104 (9th Cir. 2002), amended by 315 F.3d 1062 (9th Cir. 2002).  Neither does Petitioner demonstrate implied bias under Ninth Circuit case law, which indicates such bias "may exist in exceptional circumstances where, for example, a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." Fields, 503 F.3d at 766.  There is no indication Juror #10 had any relationship to the crime itself or lied to get on the jury.  While the juror herself revealed she knew the trial judge and had gone on "a couple of dates with him" and the judge's partner was a "former client" of hers, there is no evidence of a continued relationship despite Petitioner's speculation otherwise.  Nor does Petitioner show that a disclosed past dating relationship with the trial judge raises the prospect of emotional involvement or a lack of impartiality such that bias could or should be implied.  See Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990) ("[B]ias could be implied or presumed from the 'potential for substantial emotional involvement, adversely affecting impartiality,' inherent in certain relationships."), quoting United States v. Allsup, 566 F.2d 68, 71 (9th Cir. 1977) and citing United States v. Eubanks, 591 F.2d 513, 516-17 (9th Cir. 1979).

In Tinsley, the Ninth Circuit recounted the type of situations in which courts have found implied bias, such as "where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent

judgment even if the juror states he will," "the existence of certain relationships between the juror and the defendant," "where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern" as the trial at issue, but at the same time the Ninth Circuit noted "courts have declined to find implied bias when a juror was personally acquainted with a witness provided no actual bias existed." <u>Tinsley</u>, 895 F.2d at 528-29 (collecting cases). The instant case clearly presents the latter type of situation discussed in <u>Tinsley</u>. The Court finds Juror #10's past personal acquaintance with the trial judge is comparable to an acquaintance with a witness and similarly fails to lend itself to a finding of implied bias, particularly given the lack of any record support for a finding of actual bias on the part of the juror. Petitioner's speculation that the juror may have continued her dating relationship with the trial judge, despite the fact the only record evidence from the juror questionnaire indicated Juror #10 "had a couple of dates" with the trial judge in the past and made no reference to any continuing or present relationship or acquaintance at the time of trial, fails to amount to "exceptional circumstances" such that implied bias could reasonably be found. <u>See</u> <u>Fields</u>, 503 F.3d at 766. Accordingly, habeas relief is not available on Claim 3.[6] Nor does Petitioner demonstrate any failure to appoint counsel on state habeas review resulted in a federal due process violation. <u>See</u> <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557 (1987) (rejecting contention there was a federal constitutional right to counsel on state habeas review, reasoning: "States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well.") (internal citation omitted).

---

[6] It appears Petitioner's request for discovery centers on Claim 3. However, given Petitioner also proposes discovery questions for the trial judge and trial defense counsel concerning their actions in addition to proposing questions for Juror #10, this request also arguably concerns Claim 4 (judicial bias), Claim 6 (ineffective assistance of trial counsel), and Claim 9 (cumulative error). Because the request ostensibly relates to several claims, the Court will address it at the end of the instant Order.

### 3. <u>Claim 4</u>

In this claim, Petitioner alleges his trial was rendered fundamentally unfair because the trial judge was biased against him, citing the trial judge's prior relationship with Juror #10, the failure to dismiss that juror, errors in jury instructions, numerous rulings on the admission of evidence and denials of defense motions for mistrial and dismissal, and statements made by the trial judge throughout the trial proceedings and at sentencing. (ECF No. 27 at 27-48.) As discussed above, the Court's review of this claim is de novo.

Petitioner raised this claim in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning. (<u>See</u> ECF Nos. 38-20, 38-21.) The California Court of Appeal denied the habeas petition in which this claim was raised as untimely and denied this claim as barred because it could have been, but was not, raised on direct appeal. (ECF No. 38-19 at 2.) Again, in the absence of any attempt to rebut a presumption the state supreme court's silent denial rests on the same grounds as the state appellate court's reasoned decision, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claim 4. <u>See</u> Ylst, 501 U.S. at 803-04; <u>see also</u> <u>Wilson</u>, 138 S.Ct. at 1193.

"[T]he Due Process Clause clearly requires a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997), quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 46 (1975). "[W]hen a defendant's right to have his case tried by an impartial judge is compromised, there is structural error that requires automatic reversal." <u>Greenway v. Schriro</u>, 653 F.3d 790, 805 (9th Cir. 2011), citing <u>Tumey v. Ohio</u>, 273 U.S. 510, 535 (1927) and <u>Chapman v. California</u>, 386 U.S. 18, 23 (1967). However, a court must indulge a "presumption of honesty and integrity in those serving as adjudicators" in reviewing a claim of judicial bias. <u>See</u> <u>Withrow</u>, 421 U.S. at 47.

As an initial matter, Petitioner's contention that the presence of Juror #10 on the jury supports a finding that the trial judge was biased is without merit. As discussed in the prior

claim, the record fails to sustain any claim of actual bias on the part of Juror #10, given the juror disclosed the "couple of dates" she had with the trial judge in her questionnaire and affirmed her ability to be fair and impartial in deciding Petitioner's case. See McDonough, 464 U.S. at 556. Nor does the record support a conclusion that the prior dating relationship rises to the level of "exceptional circumstances" such that implied bias could or should be found. See Fields, 503 F.3d at 766. As discussed above, Petitioner's speculation that a relationship between the juror and trial judge may have continued lacks record support.

Petitioner also fails to demonstrate there was an appearance of bias stemming from the trial judge's failure to remove Juror #10 from the jury panel. The Ninth Circuit has explained "Supreme Court precedent reveals only three circumstances in which an appearance of bias-as opposed to evidence of actual bias-necessitates recusal," including when the judge has a "direct, personal, substantial pecuniary interest" in an outcome against one of the parties, when the judge is directly involved in a "controversy" with a party, or where the judge is "part of the accusatory process." Crater v. Galaza, 491 F.3d 1119, 1131 (9th Cir. 2007), quoting from Tumey, 273 U.S. at 523, Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971), and In re Murchison, 349 U.S. 133, 137 (1955). On this record, the Court declines to conclude this situation is one where "'the probability of actual bias on the part of the judge or the decisionmaker is too high to be constitutionally tolerable.'" Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 877 (2009), quoting Withrow, 421 U.S. at 47. Petitioner presents nothing demonstrating the trial judge in this case had any direct relationship to the case itself or to one of the parties such that his impartiality could reasonably be questioned and the Court remains unpersuaded that "couple of dates" in the past with a juror raise the possibility, much less a probability, of bias. See e.g. Greenway, 653 F.3d at 807 (rejecting judicial bias claim where "at most, there was but a brief tangential employment relationship with a member of the victims' family," where the judge had, for a few months eighteen years earlier, worked and possibly partnered with the husband of one of the victims when employed as a police officer, finding the judge "had no interest in, or relationship to, Greenway or the victims.")

1  Petitioner also asserts the trial judge's rulings and comments support a finding of
2  bias, citing remarks made during trial proceedings and at sentencing as well as rulings
3  admitting evidence, rulings concerning jury instructions, and the denial of defense motions
4  for mistrial and for judgment of acquittal based on insufficient evidence.  (See ECF No. 27
5  at 27-48.)  However, the Supreme Court has firmly rejected a contention that a finding of
6  judicial bias could reasonably be premised on a judge's record-based comments or rulings,
7  stating: "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality
8  motion" and "opinions formed by the judge on the basis of facts introduced or events
9  occurring in the course of the current proceedings, or of prior proceedings, do not constitute
10  a basis for a bias or partiality motion unless they display a deep-seated favoritism or
11  antagonism that would make fair judgment impossible."  Liteky v. United States, 510 U.S.
12  540, 555 (1994), citing United States v. Grinnell Corp., 384 U.S. 563, 583 (1966).

13  It is clear the contested comments and rulings do not reflect bias or a lack of
14  impartiality on the part of the trial judge.  For instance, Petitioner cites to the trial judge's
15  rulings on the admission of Petitioner's 2008 conviction and related photos, the admission
16  of prior incidents concerning Captain Michaels, and the trial court's refusal to admit into
17  evidence a separate 2009 incident involving BART Officer Pirone.  (ECF No. 27 at 239-
18  48.)  While the trial court erred, as discussed above in Claims 1 and 2, in failing to sanitize
19  the 2008 conviction and admitting the related photographs, the record fails to reflect the
20  trial judge's rulings were rooted in any sort of partiality.  Instead, as discussed above, the
21  record reflects the rulings were based on the evidence in question and the trial court's
22  application of state law, albeit erroneous.  Moreover, a review of the contested evidentiary
23  rulings concerning the incidents involving Michaels and Pirone similarly reflect they were
24  based on the evidence presented and the trial court's application of state law.  (See RT 11-
25  20, 424-27.)  The trial court's denial of Petitioner's motions for mistrial and for acquittal
26  based on insufficient evidence pursuant to Cal. Penal Code § 1118.1 also fail to support a
27  claim of bias.  The record reflects the defense moved for mistrial after one juror, Juror #4,
28  was reported by other jurors to have made comments and caused distractions and was

subsequently removed and replaced by an alternate juror; in denying the motion, the trial court simply and sensibly reasoned: "I say this shows you that you both probably picked a pretty good juror -- jury, I should say, with them stepping forward. And I don't see any prejudice at all. So that will be denied." (RT 734.) The denial of the § 1118.1 motion was similarly record-based. In response to defense arguments that the evidence showed the firefighters were not acting within the course of their duties during the incident, which was a required element of several of the charged counts, the trial court reasonably concluded: "Well, obviously, the standard is whether it would withstand appeal. That's the standard. And it would. So, you know, this is a good case for a jury. You're going to both argue your points, and they're going to take the facts, apply the law, and decide what happened, whether they were or weren't. So based on that, the 1118.1 is denied." (RT 909.)

Nor do the judge's contested comments demonstrate judicial bias or a lack of partiality, as it is clear they were based on the record and evidence introduced at trial. For one, Petitioner cites the trial judge's remarks referring to Captain Michaels as a "wife beater." (See ECF No. 27 at 235-36, 239, RT 19-20, 414.) Yet, upon review, those comments were made in the context of discussing the introduction into evidence prior domestic incidents between Michaels and his ex-wife and girlfriend, respectively, during each of which Michaels acted violently against the two women. While the shorthand reference to such incidents may have been blunt and unpolished, the comments clearly referred to the evidence at issue. (See e.g. RT 19) ("I agree that the fact that your fire captain, who is a wife beater, is not something that is going to determine the outcome of this case. But if he wants to introduce it, I can't tell him that it's not allowed."); (see also RT 20) ("I don't think it will mislead the jury if he is really a wife beater. And I don't see the prejudice to necessarily, in the sense that -- all right. That the firefighter is tarnished is not going to be too surprising to people in this current day and age.")

Petitioner also points to the trial judge's comment that "there's no break in the criminality" (see ECF No. 27 at 238, RT 24), in discussing the admissibility of Petitioner's prior convictions and Petitioner asserts "there were several years (average of 6) between

convictions." (<u>Id.</u> at 34.)  The contested comments were again clearly based on the record, as the parties were discussing the admissibility of a 2002 robbery for impeachment purposes, and the judge's comment directly followed the defense's argument that the robbery, which was "a year after the 2001 case," was remote in time to the instant case. (RT 24.)  A review of that discussion reflects that the judge's comment appears directed at the short period of time between a 2001 case and the 2002 robbery conviction, and not the time elapsed between the 2002 and 2008 convictions.

Finally, Petitioner points to several comments the trial judge made at sentencing, and argues such comments reflected "his personal feelings towards the firefighters" and "as to whether the firefighters were lawfully performing their duties," the latter of which was a factual dispute at trial, including comments about Petitioner's bad temper "which could only have come from the 2008 conviction," and comments "expressing his personal conclusions on the case" which Petitioner contends were improperly impacted by errors in the admission or exclusion of evidence.  (ECF No. 27 at 34-35.)

While Petitioner appears to have cherry-picked several remarks from a much lengthier statement the trial judge made at sentencing following the denial of the defense request to strike Petitioner's strike conviction, it is evident when considered in full, the contested comments were based on the judge's consideration and evaluation of the evidence introduced at trial and opinions formed as a result of that evidence, rather than any prejudgment of the case or personal opinions based on something other than the evidence presented, as follows:

> To the firefighters in this situation, I think everybody in this courtroom respects what you do.  Certainly, you can say that people respect police officers, but not in the same way they respect firefighters because, as it was said during the trial, you're running towards the trouble as everybody else is running away.  One of the things that I have taken note of, though, is how strong and how much courage you've shown throughout this.  I mean, you didn't sign up for that kind of action, and I think that you have handled it very professionally and very well, and I think that whatever medal or honor or whatever the fire department gave you was well deserved.

To Mr. Jones, I don't think you're a bad man.  I think you were actually being a good guy at the time by trying to help the other guy out.  Now, I do believe, as the prosecutor noted during his closing argument, you have a very bad temper, and unfortunately for you there's a fire captain out there that also has a real bad temper.  And basically what happened is two hotheads colliding. What are the odds of that?  It happened.  And as a result, two innocent men almost lost their lives.

This is a case too that I -- I often don't comment on jury verdicts because it's really not my place to.  But this is a case where the jurors nailed it.  They got it absolutely right.  Because the defendant intended to kill.  And then with all manslaughters, there's a but after that.  He intended to kill but. And that's where you have to fill things in.  Because he didn't get up that day, strap on his knife, and say I'm going to go down and stab a couple firemen just because that's what I want to do.  And that's where again the but comes in.  And I think the jurors who -- I spend a lot of time watching because I have a very good vantage point of being able to watch both witnesses and the jury. They paid so -- such careful attention throughout this entire trial.  And their conclusion that this did not fall within the meaning of an attempted murder was the correct one, nor was it self-defense.

I mean, there's no question that the defendant did not tell the truth on the stand.  He lied.  There's no question about that.  The video shows that. The video speaks for itself.  But I just want to say that they correctly determined the facts, they correctly applied the law, and they correctly came to the right verdict.

(RT 1410-11.)  Upon review and when considered in context, it is evident the comments were based on the evidence and did not reflect improper "favoritism or antagonism."  See Liteky, 510 U.S. at 555 ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.")

Given the "presumption of honesty and integrity in those serving as adjudicators" the Court must indulge, see Withrow, 421 U.S. at 47, coupled with the review of the record which fails to reflect any appearance of bias or a lack of impartiality, much less actual bias on the part of the trial judge, Petitioner's claim fails for lack of merit under even a de novo review.  Habeas relief is unavailable on Claim 4.

18cv2173 LAB (DEB)

4.   **Claim 5**

Petitioner asserts he was denied due process because the prosecutor suborned perjury, namely "Cpt. Michaels testimony in exchange for immunity letter for unrelated crime and not prosecuting Michaels for assault on Petitioner the day of the attack on Mr. Jones." (ECF No. 27 at 49.)  As noted above, the Court's review of this claim is de novo.

Petitioner raised this claim in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning.  (See ECF Nos. 38-20, 38-21.)  The California Court of Appeal denied the habeas petition in which this claim was raised as untimely and denied this claim as barred because it could have been, but was not, raised on direct appeal.  (ECF No. 38-19 at 2.)  Again, in the absence of any attempt to rebut a presumption that the state supreme court's silent denial rests on the same grounds as the state appellate court's reasoned decision, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claim 5.  See Ylst, 501 U.S. at 803-04; see also Wilson, 138 S.Ct. at 1193.

Specifically, Petitioner contends the video evidence presented at trial conflicts with Michaels' testimony that he made "repeated" commands to Petitioner to step back and asserts Michaels testified to a conversation that could not have occurred given the video evidence, misstated Petitioner's position during the incident, and falsely testified about Petitioner clenching his fists and swinging a knife at Michaels.  (ECF No. 27 at 50-51.)  Petitioner contends the prosecutor, who viewed the video of the incident, was aware of the false testimony and posed "leading" questions to Michaels in attempts to match time references in the video.  (Id. at 51.)

The Supreme Court has long held "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment" and "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  Napue v. Illinois, 360 U.S. 264, 269 (1959) (citations omitted); see also United States v. Bagley, 473 U.S. 667, 678-79

(1985) (noting "the well-established rule that 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'"), quoting United States v. Agurs, 427 U.S. 97, 103 (1976).  To state a claim for habeas relief based on the prosecution's use of false evidence, the Ninth Circuit has set forth three prongs that must be satisfied, instructing: "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material."  United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003), citing Napue, 360 U.S. at 269-71.

While Michaels' trial testimony appears at several points inconsistent with the video evidence and/or the witness's prior statements, Petitioner fails to show this demonstrates Michaels' testimony was actually false, much less that the prosecutor knowingly presented false testimony.  See e.g. United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997) ("The fact that a witness may have made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false.")  Instead, it is clear from the outset of Michaels' testimony that the witness stated he was unsure on some points, noting the time that had elapsed since the incident. (See e.g. RT 687) ("I'm trying to remember.  It's a long time ago."); (RT 692) (when viewing video of incident, Michaels was asked if he stepped on Petitioner and stated: "I'm not sure at this point.")  It is also evident from the testimony presented that the situation was highly charged and emotional for each of the individuals involved, including Michaels. For instance, Michaels testified: "When he swung the knife at me, I tripped and fell," and in his memory: "I fell backwards as I was trying to stay away from the swing of the knife," after Petitioner swung at Vernon.  (RT 702.)  When asked about his failure to tell the police about knife swings on the date of the incident, Michaels stated: "Well, you got to understand, this is a very emotional time for me.  So I don't know what I told the police department at that particular time."  (RT 703.)  However, Michaels acknowledged that he also failed to mention any knife swings in a later statement to an investigator or during his

preliminary hearing testimony and that the first time he mentioned it was at trial. (RT 704-05.) Michaels stated: "Like I said, emotions are running high. There's a lot of things I remember now that I didn't remember then" and at the same time noted that he originally thought he put his foot behind Petitioner's before pushing him but noted the video did not show it. (RT 716.) As such, rather than demonstrating Michaels testified falsely, the record instead reflects the witness recounted the events surrounding the incident to the best of his ability and memory and acknowledged that some things he recalled had not occurred and he recalled some things later after emotions had settled down.

Nor does Petitioner's suggestion that Michaels testified "in exchange for immunity letter for unrelated crime and not prosecuting Michaels for assault on Petitioner the day of the attack on Mr. Jones" (see ECF No. 27 at 49), support a conclusion that Michaels testified falsely at trial. First, the record fails to reflect the prosecutor ever considered charging or prosecuting Michaels for initiating the physical confrontation with Petitioner. The only grant of immunity introduced and discussed at trial concerned a letter from the prosecutor reflecting statements that Michaels made concerning his 2015 domestic incident or evidence derived from such statements would not be used against him. (RT 680.) Michaels stated he wanted to testify in Petitioner's case and understood the letter meant only what he said in Petitioner's case could not be used in that other case. (RT 681.) In any event, the prosecutor also confirmed Michaels's understanding that he must testify truthfully, asking: "And then the understanding that, obviously, this doesn't immunize you from any type of perjury; right?" to which Michaels replied: "That is correct." (RT 680.)

Even were the Court to assume without deciding that Petitioner could both show Michaels' testimony was false in one or more of the respects alleged and the prosecutor knew or should have known of the falsity, and even though it appears more reasonable that the bulk of any discrepancies between Michaels' testimony and the video are likely attributable to the chaotic and stressful nature of the incident and the time that elapsed between the incident and trial, this claim would still fail for lack of materiality. See Bagley, 473 U.S. at 678-79 (noting "the well-established rule that 'a conviction obtained by the

knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'"), quoting <u>Agurs</u>, 427 U.S. at 103.

The contested aspects of Michaels' testimony were each addressed at trial, as defense counsel vigorously cross-examined Michaels on his failure to previously mention the allegation that Petitioner swung a knife at Michaels during the incident (RT 704-05) and Michaels' contention that in the short time he spoke to Petitioner as reflected in the video clip, Michaels obtained information from Petitioner on the patient and told Petitioner to step back four times.  (RT 710.)  Michaels also acknowledged when he shoved Petitioner that it was a deliberate act and knew there was a bench and pillar behind Petitioner (RT 715-17), conceded he had a temper and had been working on it a long time (RT 720), and acknowledged there was no physical altercation prior to him shoving Petitioner over the bench.  (RT 724-25.)  Additionally, not only were the surveillance and body camera videos of the incident used and played during the witnesses' testimony, but both the prosecutor and defense also cited to and played portions of the videos during their closing arguments to the jury.  (See <u>e.g.</u> RT 1141-42, 1147, 1174-75, 1178, 1180-81, 1198-99.)  The videos were also introduced as exhibits and sent back with the jurors to assist them with their deliberations.  (<u>See</u> RT 1201) ("During the trial, several items were received into evidence as exhibits.  You may examine whatever exhibits you think will help you in your deliberations.  These exhibits will be sent into the jury room with you when you begin to deliberate."); (<u>see also</u> RT 1204-05) (discussion on which electronics to send to jury room so jury could view videos).

Because Petitioner fails to persuasively show that Michaels' testimony was false, the prosecutor knew it was false, and it was material given Michaels was subjected to cross-examination on the disputed areas cited by Petitioner and the surveillance and body camera videos were played for the jury and made available to them for consideration in their deliberations, Claim 5 fails for lack of merit under even a de novo review.  <u>Zuno-Arce</u>, 339 F.3d at 889, citing <u>Napue</u>, 360 U.S. at 269-71.  Habeas relief is not available on Claim 5.

**5.** **Claim 6**

Petitioner contends trial counsel rendered ineffective assistance in violation of Petitioner's federal constitutional rights, citing counsel's failure to challenge Juror #10 and opening the door to propensity evidence against Petitioner by calling Michaels' girlfriend and ex-wife as witnesses and by cross-examining Michaels on those prior incidents. (ECF No. 27 at 53-60.) Respondent maintains the state appellate court reasonably applied clearly established law in rejecting this claim. (ECF No. 37-2 at 25, citing Lodgment No. 16.) As discussed above, the Court's review of this claim is de novo.

Petitioner raised this claim in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without a statement of reasoning. (See ECF Nos. 38-20, 38-21.) The California Court of Appeal denied the petition as untimely and specifically stated "the claim alleging ineffective assistance of counsel not only is barred as untimely but also fails to state a prima facie case because it does not adequately plead the required element of prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (petitioner alleging ineffective assistance of counsel must show prejudice); *People v. Duvall* (1995) 9 Cal.4th 464, 474 (habeas corpus petitioner may not rely on bare allegations but must support claim with reasonably available documents).)" (ECF No. 38-19 at 2.) Again, in the absence of any attempt to rebut a presumption the state supreme court's silent denial rests on the same grounds as the state appellate court's reasoned decision, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claim 6. See Ylst, 501 U.S. at 803-04; see also Wilson, 138 S.Ct. at 1193; see also Frantz, 533 F.3d at 738-39 (reasoning of state court relevant to determination of whether constitutional error occurred under even a de novo review).

"[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009), citing Strickland v. Washington, 466 U.S. 668, 687 (1984). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky,

559 U.S. 356, 371 (2010).  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 687-88.  Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Id. at 689.  To demonstrate prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

First, with respect to Petitioner's contention that trial counsel rendered ineffective assistance in failing to challenge Juror #10, Petitioner fails to demonstrate deficient performance.  Again, the record reflects Juror #10 disclosed in the written questionnaire her prior acquaintance and dating relationship with the trial judge and affirmed she was able to be a fair and impartial juror in Petitioner's case.  The Court must "indulge a strong presumption" trial counsel acted "within the wide range of reasonable professional assistance" in refraining from challenging the juror.  See Strickland, 466 U.S. at 689.  In the absence of any record indication why trial counsel failed to challenge Juror #10, coupled with the clear lack of evidence Juror #10 was either impliedly or actually biased, (see Claim 3, supra), Petitioner fails to show trial counsel acted deficiently in this respect.

Second, with respect to Petitioner's assertion trial counsel acted deficiently in calling witnesses and cross-examining Michaels about prior domestic incidents, Petitioner again fails to rebut a presumption that counsel's actions were reasonable.  First, as Respondent correctly points out, Michaels' wife didn't testify at trial, as she invoked marital privilege and the trial court upheld the privilege.  (See RT 454, 457.)  Of the two, only Michaels' girlfriend testified at trial.  (See RT 924.)  Evidence of both incidents was introduced, but it is clear counsel's strategy was to focus on the fact that Michaels initiated a physical encounter by pushing Petitioner and contending Petitioner was thereafter forced to defend

45

himself.  Because evidence of Michaels' prior violent domestic incidents supported that defense, this strategy appears to fall well within the "wide range of professionally competent assistance." Strickland, 466 U.S. at 690; see also Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998) ("[T]he relevant inquiry under Strickland is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.")

Even were Petitioner able to demonstrate trial counsel acted deficiently in either failing to object to Juror #10's presence on the jury, calling Michaels' girlfriend to testify, or introducing evidence of Michaels' prior domestic incidents, Petitioner's claim would still fail for lack of prejudice.  Mirzayance, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."), citing Strickland, 466 U.S. at 687.  Again, Petitioner fails to show Juror #10 was biased, either through actual or implied bias, given she readily disclosed the "couple of dates" she had with the trial judge in her questionnaire and affirmed her ability to be fair and impartial in deciding Petitioner's case.  See McDonough, 464 U.S. at 556; see also Fields, 503 F.3d at 766.  As such, even were Petitioner somehow able to show deficient performance in this respect, the Court finds no "reasonable probability that, but for counsel's unprofessional errors," in failing to object to her presence on the jury, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  Nor does Petitioner demonstrate prejudice from the admission of Michaels' prior violent incidents allowing for the admission of Petitioner's prior convictions.  As discussed in Claims 1 and 2 above, because Petitioner testified at trial, the fact of his prior conviction was at a minimum admissible for impeachment purposes and to allow the jurors to evaluate his credibility.   In view of the other evidence presented at trial, the Court finds no "reasonable probability" of a different verdict had trial counsel acted differently and refrained from presenting the impeachment evidence concerning Michaels to attempt to prevent the introduction of evidence concerning Petitioner's priors.  Strickland, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the

outcome.")  Claim 6 fails on the merits under even a de novo review and as such, habeas relief is not warranted.

### 6.   **Claims 7 and 10**

In Claims 7 and 10, Petitioner asserts two jury instructional errors.  In Claim 7, Petitioner asserts the trial court erred in instructing the jury with CALCRIM 3471 and in Claim 10, Petitioner asserts the modified jury instructions defining a firefighter's duties were improper, violating his federal constitutional rights to due process and a fair trial. (ECF No. 27 at 61-71, 92-94.)  Respondent maintains the state court rejection of both claims was reasonable.  (ECF No. 37-2 at 27.)

Petitioner raised Claims 7 and 10 in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without explanation. (See ECF Nos. 38-4, 38-5.)  The Court will again "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to both Claims 7 and 10.  See Ylst, 501 U.S. at 804.  The state appellate court rejected Petitioner's Claim 7 contention the trial court's alleged error in instructing the jury with CALCRIM 3471 violated Petitioner's rights, reasoning as follows:

*1. Additional Background*

CALCRIM No. 3471 pertains to the right to self-defense where the defendant is the initial aggressor or engages in mutual combat.  The trial court agreed to modify the instruction to eliminate the language regarding mutual combat.  Defense counsel objected to giving the modified instruction arguing it was inconsistent with the defense theory, not supported by the evidence, and would confuse the jury. The People agreed Michaels first used violence, but the jury could conclude that Jones was the initial aggressor in his altercations with Perezdeleon or Vernon.  The court instructed the jury with the following modified version of CALCRIM No. 3471:

"A person who starts a fight has a right to self-defense only if:

"1. He actually and in good faith tried to stop fighting;

"AND

"2. He indicated, by word or by conduct, to his opponent, in a

way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;

"AND

"3. He gave his opponent a chance to stop fighting.

"If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

*2. Analysis*

Jones contends the trial court erred in instructing the jury with CALCRIM No. 3471 because the evidence did not support the instruction. In making this argument, Jones focuses on Michaels's actions to argue that Michaels was the initial aggressor.

While it is undisputed that Michaels initiated physical contact with Jones by pushing him and causing him to fall, witness testimony shows Jones got up and then attacked Perezdeleon. Based on this evidence, the jury could have found Jones was the initial aggressor towards the security officers. Accordingly, the evidence supported giving this instruction. To the extent the jury could have concluded that Michaels was the initial aggressor for the entire incident, the court instructed jurors to ignore any inapplicable instructions. (CALCRIM No. 200.) We presume the jury did so. (*People v. Edwards* (2013) 57 Cal.4th 658, 746 (we presume jurors understand and follow a court's instructions).)

Jones next asserts the instruction failed to properly explain how the right of self-defense applied, and can or cannot be lost and regained, when someone in the victim's group acts as the initial aggressor. We disagree.

CALCRIM Nos. 505 and 3470 regarding self-defense for homicide and non-homicide counts instructed jurors to consider "all the circumstances as they were known to and appeared" to Jones in deciding whether Jones's beliefs were reasonable. These instructions also told jurors that if someone associated with Vernon or Wallbrett threatened Jones, they could consider this threat in deciding whether Jones justifiably acted in self-defense. This

language allowed the jury to consider Jones's defense theory that he acted reasonably in defending himself as to all individuals associated with Michaels after Michaels shoved him.  We presume the jurors were intelligent people capable of understanding and correlating all of the instructions they received. (*People v. Musselwhite*, *supra*, 17 Cal.4th at p. 1248.) Because the trial court did not err when instructing the jury with CALCRIM No. 3471, we reject Jones's argument that giving this instruction violated his rights to a jury trial, due process and to present a defense.

(ECF No. 38-1 at 31-33.)

In evaluating a claim of instructional error, the question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.  Even if federal constitutional error occurred, habeas relief is only available if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

Petitioner alleges the trial court erred in instructing the jury with CALCRIM 3471 because "insufficient evidence supported instructing Jones was the initial aggressor" and "the instruction failed to explain that initial aggressor status is not determined individual-by-individual when a group, not an individual, is involved in the aggression."  (ECF No. 27 at 61-62.)  With respect to the first contention, the state court acknowledged "[w]hile it is undisputed that Michaels initiated physical contact with Jones by pushing him and causing him to fall, witness testimony shows Jones got up and then attacked Perezdeleon," and as such, the instruction was supported by the record evidence because "the jury could have found Jones was the initial aggressor towards the security officers."  (ECF No. 38-1 at 32.)  The state court also found: "To the extent the jury could have concluded that Michaels was the initial aggressor for the entire incident, the court instructed jurors to ignore any inapplicable instructions."  (Id.)

Upon a review of the record, the state court's assessment was reasonable. While it is uncontested Michaels originated a physical altercation by pushing Petitioner, witnesses testified Petitioner got up and ran not at firefighter Captain Michaels, but at transit officer Perezdeleon, who Petitioner then repeatedly punched. Perezdeleon, for instance, saw Michaels push Petitioner, who fell and "what I remember is when he got up, as he's positioned, he's looking at me. I'm not in the picture there yet, but as soon as he gets up, right away he goes into a defense mode and he just starts attacking me. I don't know why. I wasn't the one who pushed him. As soon as he got up, he went towards me." (RT 549.) Perezdeleon stated: "We start going at it. We start fighting. He starts punching me, and I started blocking the hits," and acknowledged hitting Petitioner back only after Petitioner first hit him multiple times in short succession. (Id.) Another transit officer, Scherer, also testified that after the push by Michaels, Perezdeleon did not approach Petitioner, but: "I saw the defendant get up and rush toward Perezdeleon and start hitting him with a closed fist." (RT 586.) Firefighter West stated after Petitioner's initial scuffle with transit officers following the push from Michaels, Petitioner ran at a transit officer and "[t]he defendant punched the MTS officer in the face I can't remember how many times." (RT 747.)

It is also clear from the witness testimony and surveillance video that firefighter Vernon had his hands up and appeared to be attempting to verbally diffuse the situation when Petitioner advanced on and stabbed him. Scherer did not hear Vernon say anything to Petitioner, stating "[i]t appeared like he was trying to calm him down." (RT 590.) Scherer also did not see Vernon make any advance towards Petitioner, but instead saw Petitioner approach Vernon and "I saw him strike him in the side twice: Once in the lower back, once right below the shoulder." (Id.) Firefighter Wallbrett testified after the transit officers sprayed Petitioner with pepper spray, "I see the defendant basically turn from the MTS security guards and clue in on my partner," Vernon. (RT 621.) Wallbrett stated Vernon was "[d]efenseless, with his hands up." (RT 629.) West saw Vernon jump over the rail, similarly stated he did not hear any verbal threats or see any force used by Vernon, but instead heard Vernon say, "wait, wait." (RT 749.) West "honestly thought that

[Petitioner] was going to run north on Park, but what changed was he stopped, turned, and faced Firefighter Vernon," and "[i]t appeared that the defendant was going to come after Ben Vernon," while Vernon was saying "wait, wait" and Vernon had his hands up with the palms out.  (RT 750-51.)  Firefighter Vernon testified he tried to verbally calm Petitioner down "[t]he whole time" and "was trying to diffuse the situation."  (RT 799.)  Vernon stated he saw Petitioner reach behind himself for something, to which Vernon talked faster to try to calm Petitioner and never charged, threatened, or punched Petitioner but instead kept his hands up and "was staring at his waist," stating "when he came running at me, I was just still, like, looking down, trying to see what was there."  (RT 801-02.)

As the state court correctly observed, Petitioner's jury was told the provided instructions might not all apply depending on their findings and were directed to only follow those that applied.  (See CT 663) ("Some of these instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.")  As such, the state court's conclusion that the jury was free to ignore CALCRIM 3471 depending on their factual findings was objectively reasonable.  (See ECF No. 38-1 at 32) ("To the extent the jury could have concluded that Michaels was the initial aggressor for the entire incident, the court instructed jurors to ignore any inapplicable instructions. (CALCRIM No. 200.) We presume the jury did so. (*People v. Edwards* (2013) 57 Cal.4th 658, 746 (we presume jurors understand and follow a court's instructions).)")

With respect to Petitioner's second contention, that CALCRIM 3471 failed to properly address initial aggressor status in a group versus individual altercation, rather than in an individual versus individual confrontation, the state court noted that two other jury instructions concerning self-defense, specifically CALCRIM 505 and 3470, "instructed jurors to consider 'all the circumstances as they were known to and appeared' to Jones in deciding whether Jones's beliefs were reasonable," that "[t]hese instructions also told jurors that if someone associated with Vernon or Wallbrett threatened Jones, they could

51

consider this threat in deciding whether Jones justifiably acted in self-defense," and reasoned "[t]his language allowed the jury to consider Jones's defense theory that he acted reasonably in defending himself as to all individuals associated with Michaels after Michaels shoved him."  (ECF No. 38-1 at 33.)  Because the Court must consider the challenged instruction "in the context of the instructions as a whole and the trial record," and not "'in artificial isolation,'" it is clear from the Court's review of the entire complement of instructions the jury was properly informed of the considerations regarding self-defense and was not precluded or prevented from considering Petitioner's claim that he acted in self-defense against all of the transit officers and firefighters after one of those individuals, firefighter Captain Michaels, started the physical altercation by pushing Petitioner.  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.  The jury was also instructed to consider the instructions together.  (See CT 663, CALCRIM 200) ("Pay careful attention to all these instructions and consider them together.  If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it.")

As the state court reasonably pointed out, the trial court gave several other jury instructions on self-defense, two of which specifically directed the jurors to "consider all the circumstances" in determining whether Petitioner's belief in the need to use force to defend himself was reasonable.  Specifically, both CALCRIM 505, which related to self-defense with respect to the attempted murder and attempted voluntary manslaughter charges in counts one and two, and CALCRIM 3470, which related to self-defense with respect to the non-homicide counts charged in counts three through six, contained identical passages directing as much.  (See CT 688, 705, CALCRIM 505, 3470) ("When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.")  As the state court also noted, the jury instructions included language providing that if Petitioner was threatened by an individual "that he reasonably associated" with the alleged victims, the jury could

consider that in determining whether self-defense was justified.  (See CT 688, CALCRIM 505) ("If you find that the defendant received a threat from someone else that he reasonably associated with Benjamin Vernon or Alexander Walbrett, you may consider that threat in deciding whether the defendant was justified in acting in self-defense."); (see also CT 706, CALCRIM 3470) ("If you find that the defendant received a threat from someone else that he reasonably associated with Alberto Perez de Leon, Matthew Martin, Benjamin Vernon, or Alexander Walbrett, you may consider that threat in deciding whether the defendant was justified in acting in self-defense.")  A jury is presumed to understand and follow the trial court's instructions.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 211 (1989).

A review of closing arguments to the jury reflects the defense was not prevented from arguing Petitioner used reasonable force to defend himself as an individual against a group.  (See e.g. RT 1183-84) ("Four on one, five on one, six on one.  It's only me, and they keep creeping in.  And that's how we get to self-defense.  That's how we get to this instruction."); (RT 1185) ("Six-on-one situation.  Mr. Jones was the one who was attacked, and Mr. Jones was the one who was assaulted . . . And in a six-on-one situation where you're blinded, where people are yelling at you, where they're closing off any avenue to leave, you're going to use whatever force is necessary to defend yourself.  And when we think about the defense and the use of force in this case, those are the circumstances we consider.  And the jury instruction makes that clear.  It's not just consider it as you are sitting here in the jury.  It's consider it from the point of view that Mr. Jones did as he was blinded, surrounded, and beat up all because he was trying to help."); (see also RT 1191) ("This is a case of perfect self-defense.  Mr. Jones was being harmed.  He reasonably believed that more harm was coming, and he used force that someone in his situation would have used when it's a six-on-one melee and he's under attack.")

Based on a review of the jury instructions as a whole and the trial record, including witness testimony as well as closing arguments to the jury, the Court cannot conclude CALCRIM No. 3471 "'by itself so infected the entire trial that the resulting conviction

violates due process.'" <u>McGuire</u>, 502 U.S. at 72, quoting <u>Cupp</u>, 414 U.S. at 147.  Not only does Petitioner fail to show that the trial court erred in instructing the jury with CALCRIM No. 3471, Petitioner also fails to demonstrate that any alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637.  Because Petitioner has not shown the state court decision was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, habeas relief is not available on Claim 7.

With respect to Claim 10, the state appellate court first discussed the background concerning the given instructions defining a firefighter's duties, including the testimony of experts called by both the prosecution and defense, who each testified about the San Diego Fire Department's "stand back policy" and rendered opinions on whether the firefighters were acting within the scope of their duties during the incident involving Petitioner.  (ECF No. 38-1 at 24-25.)   The state court recounted the decision to provide a definition concerning firefighter's duties, stating: "Because the CALCRIM instructions did not define the duties of a firefighter, the People requested a modification to define those duties. Defense counsel objected to a definition that included 'protecting the safety of the community,' asserting the phase was vague and overbroad as it suggested firefighters on a call could break up any fights that erupt as part of their duties. The court indicated it would consider the matter over the weekend. The court added the following language to CALCRIM Nos. 602, 860 and 900: 'The duties of a firefighter include, but are not limited to, responding to 911 calls, fighting fires, providing medical care, and protecting the safety of the community.'"  (<u>Id.</u> at 25-26.)   The state appellate court rejected Petitioner's contention that the modified jury instructions defining a firefighter's duties were improper and violated his rights, reasoning as follows:

> Jones contends that the modifications to CALCRIM Nos. 602, 860 and 900 constituted improper pinpoint instructions because the instructions assumed facts favorable to the prosecution; i.e., that the firefighters entered the fight with Jones under the guise of protecting the safety of the community. Because the modified instructions defined firefighting duties broadly, Jones

contends that the instructions effectively told the jury that an element of counts 1 through 4, requiring that Vernon and Wallbrett were performing their firefighting duties, had been established. We are not persuaded.

In every criminal prosecution it is necessary to establish the "corpus delicti," that is, the body or the elements of the crime. (*People v. Lopez* (1967) 254 Cal.App.2d 185, 189.) Here, the jury convicted Jones of two counts each of attempted voluntary manslaughter (counts 1 and 2), and assault with a deadly weapon on a firefighter (counts 3 and 4) for stabbing Vernon and Wallbrett.  Both crimes included the requirement that Vernon and Wallbrett were "engaged in the performance of (their) duties." (Pen. Code, §§ 664, subd. (e), 245, subd. (c).)  Accordingly, the lawfulness of Vernon and Wallbrett's conduct formed part of the corpus delicti of these offenses. (See *People v. Henderson* (1976) 58 Cal.App.3d 349, 358-359 (addressing battery upon a peace officer).) The question whether Vernon and Wallbrett were engaged in the performance of their duties amounted to a question for the jury to decide. (*People v. Flood* (1998) 18 Cal.4th 470, 524 (prosecution must prove all elements of charged offenses beyond a reasonable doubt).)

Defense counsel did not dispute that the trial court needed to define the duties of a firefighter because an element of the crimes of attempting to murder Vernon and Wallbrett and assaulting Vernon and Wallbrett, included the requirement that Vernon and Wallbrett were lawfully performing their firefighter duties. Defense counsel argued that the portion of the instructions defining firefighter duties as including "protecting the safety of the community" was too vague and too broad. Defense counsel, however, did not suggest how firefighter duties should be defined.

At trial, Ricci noted that every firefighter takes an oath, the first line of which states: "As a firefighter, my fundamental duty is to protect and save lives and safeguard property in the service of my community." He testified that firefighters "have a duty to act" and are not prohibited from protecting their patient, themselves, the scene and citizens on the scene.  If a confrontation breaks out, firefighters have a duty to stay with the patient, protect themselves, the scene and citizens. Dr. Streed was also familiar with first line of the firefighter's oath.  He "strongly suspected" that the Department considered the first line of the firefighter's oath the most important duty over all else, stating, "I think it's (a) reasonable and an accurate policy."

On appeal, Jones does not suggest how the trial court should have defined the duties of a firefighter for the jury.  He does not argue that

"protecting the safety of the community" is not within the duties of a firefighter, and thus, constituted an incorrect instruction.   Rather, this statement is a reasonable paraphrasing of the firefighter's oath.  Jones also failed to show how this statement misled the jury, directed the jury's attention to specific evidence, or invited the jury to draw inferences favorable to the prosecution.  Rather, viewing the jury instructions as a whole, the trial court properly instructed the jury that the prosecution needed to prove each crime beyond a reasonable doubt (CALCRIM No. 220), that counts 1 through 4 included the requirement that Vernon and Wallbrett were "lawfully performing their duties" as firefighters and that the prosecution needed to prove this allegation (CALCRIM Nos. 602, 800, 900), and the jury needed to evaluate the conflicting evidence (CALCRIM No. 302).

Jones next asserts that the instructions improperly directed a verdict in favor of the prosecution.  The impermissible directing of a verdict or finding "'includes perforce situations in which the judge's instructions fall short of directing a verdict but which nevertheless have the effect of so doing by eliminating other relevant factual considerations if the jury finds one fact to be true.'" (*People v. Figueroa* (1986) 41 Cal.3d 714, 724 (*Figueroa*).)  The *Figueroa* court addressed "whether the trial court, in a prosecution for the sale of unqualified securities, erred in instructing the jury that certain 'Corporation Promissory Notes' were 'securities' within the meaning of the Corporate Securities Law." (*Figueroa*, at p. 717.) While the definition of the term "security" was a question of law (*id.* at p. 733), "(w)hether a particular piece of paper meets that definition, however, is for the jury to decide." (*Id.* at p. 734.) The instruction therefore improperly removed an element of the offense "from the jury's consideration." (*Id.* at p. 741.)

In contrast, in *People v. Brown* (1988) 46 Cal.3d 432 (*Brown*), the defendant was charged with murder, with the special circumstance that the victim was a peace officer engaged in the performance of his or her duties. (*Id.* at p. 441.) The instruction on the special circumstance stated: "'For the purposes of these instructions, a Garden Grove Regular Police Officer and a Garden Grove Reserve Police Officer are peace officers.'" (*Id.* at p. 443, italics omitted.) Our high court held this instruction did not remove an element of the special circumstance from the jury's consideration in violation of due process, noting: "The challenged final sentence took no element from the jury; it merely instructed the jury on a point of statutory law—a point not open to dispute—that a Garden Grove police officer is a peace officer. (Citations.) The jury was left to make all essential factual determinations, including whether the victim was a Garden Grove police officer." (*Id.* at pp. 443-444,

fn. omitted.)

In *People v. James* (1998) 62 Cal.App.4th 244, the trial court instructed the jury that manufacturing methamphetamine was a dangerous felony. (*Id.* at p. 271.) The appellate court affirmed, holding that manufacturing methamphetamine was in fact a dangerous felony and that the trial court did not err in so instructing the jury. "As we held in part I, *ante*, manufacturing methamphetamine is an inherently dangerous felony as a matter of law. Here, the challenged instructions correctly so informed the jurors. They still had to find every factual element of the crime, including whether defendant's conduct constituted the felony of manufacturing methamphetamine, and whether her children's deaths occurred during or as a direct causal result of the commission or attempted commission of this felony. Thus, the instructions are not analogous to the one struck down in *Figueroa*. . . . We conclude they did not take any issue of fact away from the jury." (*James*, at p. 273.)

The instructions at issue are analogous to those in *Brown* and *James*, and distinguishable from *Figueroa*. The challenged instructions did not establish a fact at dispute in this case. The question whether Vernon and Wallbrett were performing their firefighter's duty of "protecting the safety of the community" when they engaged Jones rather than standing back was a factual issue the jury needed to decide.  On this matter, the prosecutor argued that Vernon and Wallbrett were doing their job in protecting and safeguarding lives when Jones stabbed them.  In contrast, defense counsel argued that the "duties start(ed) to go by the by" after Michaels shoved Jones.  Defense counsel argued that Vernon and Wallbrett had a duty to stand back and not get involved no matter how good their intentions, and they stepped outside their duties when they crossed the railing between them and Jones. Nothing in the instructions impermissibly invaded the jury's fact finding function.

Jones also argues that because the instructions told jurors that firefighter duties included "responding to 911 calls," this was tantamount to instructing jurors the firefighters were lawfully performing their duties as firefighters because they were on the scene in response to a 911 call. We disagree.

First, defense counsel did not object to this portion of the instruction and thus forfeited this challenge.  (*People v. Fauber* (1992) 2 Cal.4th 792, 831.) In any event, this argument presupposes that *everything* a firefighter does when responding to a 911 call is within the scope of the firefighter's duties.   The divergent arguments of the prosecutor and defense counsel

1   regarding Vernon's and Wallbrett's actions after they arrived at the scene
2   dispelled this notion.

3   (ECF No. 38-1 at 26-31.)

4   Again, Petitioner challenges the language added to three jury instructions, namely
5   CALCRIM 602 (attempted murder of a firefighter), 860 (assault on firefighter with a
6   deadly weapon) and 900 (assault on firefighter), which stated: "The duties of a firefighter
7   include, but are not limited to, responding to 911 calls, fighting fires, providing medical
8   care, and protecting the safety of the community."   (CT 686-87, 694-95, 698-99.)
9   Petitioner asserts the additions to each instruction erroneously invited jurors to "ignore the
10  evidence that Vernon and Walbrett [sic] were not lawfully performing firefighting duties
11  because each had violated mandatory stand-back policy" and "to draw an inference
12  favorable to only the prosecution based on the trial evidence." (ECF No. 27 at 92.)  First,
13  it is evident there was a need to define a firefighter's duties, given that each of those three
14  charged crimes included an element requiring proof Petitioner "knew, or reasonably should
15  have known," the alleged victim "was a firefighter who was performing his duties."  (CT
16  687, 695, 698.)  Moreover, as the state court reasonably pointed out, Petitioner "d[id] not
17  suggest how the trial court should have defined the duties of a firefighter for the jury" and
18  "d[id] not argue that 'protecting the safety of the community' is not within the duties of a
19  firefighter, and thus, constituted an incorrect instruction."  (ECF No. 38-1 at 28.)

20  When considered in the context of the entirety of the jury instructions, Petitioner's
21  contention that this definition of a firefighter's duties erroneously invited jurors to "ignore
22  the evidence that Vernon and Walbrett [sic] were not lawfully performing firefighting
23  duties because each had violated mandatory stand-back policy" or "to draw an inference
24  favorable to only the prosecution based on the trial evidence" (see ECF No. 27 at 92), is
25  clearly refuted.  See McGuire, 502 U.S. at 72 ("It is well established that the instruction
26  'may not be judged in artificial isolation,' but must be considered in the context of the
27  instructions as a whole and the trial record."), quoting Cupp, 414 U.S. at 147.  CALCRIM
28  602, 860 and 900 each also specifically instructed that to find Petitioner guilty of the

charged crimes required that the jurors first find the prosecution proved the alleged victim was lawfully performing firefighting duties when Petitioner acted. (See CT 686, CALCRIM 602) (requiring in relevant part the prosecution must prove "Benjamin Vernon was a firefighter lawfully performing his duties as a firefighter."); (CT 687, CALCRIM 602) (requiring in relevant part the prosecution must prove "Alexander Wallbrett was a firefighter lawfully performing his duties as a firefighter."); (CT 860, CALCRIM 860) (requiring in relevant part the prosecution must prove "When the defendant acted, the person assaulted was lawfully performing his duties as a firefighter."); (CT 698, CALCRIM 900) (requiring in relevant part the prosecution must prove "When the defendant acted, the person assaulted was lawfully performing his duties as a firefighter.") As the state court observed, the jurors were also instructed the prosecution was required to prove Petitioner's guilt beyond a reasonable doubt and were instructed on the consideration of conflicting evidence. (See CT 667, CALCRIM 220; see also CT 676, CALCRIM 302.) As such, Petitioner fails to show the contested portion of those instructions "by itself so infected the entire trial that the resulting conviction violates due process.'" McGuire, 502 U.S. 62, 72 (1991), quoting Cupp, 414 U.S. at 147.

The prosecution and defense presented expert testimony and argument on the disputed matter of whether firefighters Vernon and Wallbrett were lawfully performing their duties at the time of the altercation with Petitioner. As the state court recounted, the prosecution's expert was a deputy chief of operations with the San Diego Fire-Rescue Department who concluded: "Vernon did not violate any policies or procedures when he jumped over the railing," that "Wallbrett acted within his duty as a firefighter by rushing to aid his partner, and "opined that Vernon and Wallbrett were 'absolutely' acting within their duties as firefighters when Jones stabbed them and '(t)hey did nothing wrong.'" (ECF No. 38-1 at 25.) The defense expert, meanwhile, was a forensic behavioral scientist and retired deputy sheriff who was provided with "a hypothetical question closely mirroring the facts of this case," to which he "opined that firefighters were required to retreat until law enforcement arrived" and "the firefighters were not acting within the scope of their

duties when they climbed over a handrail and approached a threatening person."  (Id.)
After the jury was instructed, instructions which included contested language at issue here
(see RT 1120-21, 1127, 1131), both the prosecution and defense addressed the duties of a
firefighter in their respective closing arguments to the jury.  The prosecutor again cited
their expert's testimony that the firefighters "'did nothing wrong, and I would have done
the same thing'" asserted the "[f]undamental duty is to protect and safeguard lives," that
Vernon "[d]id nothing wrong" and that with respect to Wallbrett's actions, even the
defense's expert acknowledged "it was a reasonable thing to do -- he went to try to protect
his partner." (RT 1156-57.)  Defense counsel, meanwhile, contended the firefighters "had
a duty to stay with their patient" and "had a duty to stand back, not to get involved no
matter how good their intentions were," and while, citing the defense expert's opinion, it
was "reasonable for a person to do, to jump over that railing for Alexander Wallbrett to try
to help Mr. Vernon, that places them outside their duties the second they cross this barrier."
(RT 1188.)  Thus, contrary to Petitioner's assertion that this instruction prevented the jury
from determining whether the firefighters were acting within the scope of their duties and
somehow directed a decision on that matter in favor of the prosecution, it is instead clear
the instruction readily lent itself to two reasonable and divergent interpretations that the
jurors were properly charged with deciding between.

Not only does Petitioner fail to show that the trial court erred in instructing the jury
on the definition of the duties of a firefighter as outlined above, in view of the instructions
as a whole and the Court's review of the trial record, Petitioner fails to demonstrate that
any alleged error had a "substantial and injurious effect or influence in determining the
jury's verdict." Brecht, 507 U.S. at 637.  Because Petitioner has not shown the state court
decision was either contrary to, or an unreasonable application of, clearly established
federal law, or that it was based on an unreasonable determination of the facts, habeas relief
is not available on Claim 10.

///

///

### 7.   **Claim 8**

Petitioner asserts "[t]he federal and state due process clauses require reversal on all counts because the prosecution evidence was insufficient as a matter of law to prove that Jones did not act in lawful self defense." (ECF No. 27 at 72.)   Respondent maintains the state court rejection of this claim was reasonable.  (ECF No. 37-2 at 32-34.)

Petitioner raised Claim 8 in a petition for review in the California Supreme Court and the California Supreme Court's denial of that petition was without explanation.  (See ECF Nos. 38-4, 38-5.)  The Court will again "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claim 8.  See Ylst, 501 U.S. at 804.  The California Court of Appeal denied this claim in a reasoned opinion as follows:

A. *Additional Background*

Jones testified in his own defense.  He admitted that he pleaded guilty to robbery in 2002. In 2008 he pleaded guilty to battery on a peace officer causing injury.  During that incident Jones claimed an officer pepper sprayed his face and then began hitting him with a baton for no apparent reason. He then hit the officer in the face in self-defense. Jones claimed the officer hit him in the face with the baton, even though a picture of Jones's face disclosed no injuries. Jones claimed that the 2008 incident caused him to have a lasting distrust for law enforcement. During the current incident security guards pepper sprayed him multiple times; however, he was not totally blind and could see blurs and shapes out of his good eye. Jones admitted that Vernon's hands were in the air when he stabbed Vernon.

Additionally, based on his observations before the altercation began, Jones knew that he had stabbed firefighters. Although Vernon had his hands up and never verbally threatened Jones, Jones believed Vernon posed a threat to him. Jones admitted that before he stabbed Wallbrett, Wallbrett had not touched or threatened him.  Jones claimed that after being pushed over a bench, thrown over a railing and pepper sprayed, he pulled out his knife in self-defense because he did not want to die that day.

*///*

*///*

B. *Analysis*

Jones contends his convictions must be reversed because the evidence shows, as a matter of law, that he acted in self-defense when he pulled out his knife after being pushed over a bench, thrown over a railing, pepper sprayed and then surrounded by uniformed men. He argues that the People erroneously analyze the issue on a victim-by-victim basis, noting that the victims were associated with one another, appeared to act in concert and the events occurred over a short period of uninterrupted time.  We reject Jones's argument that the evidence shows self-defense as a matter of law.

At trial, the People have the burden of persuasion to show the nonexistence of a defense that negates an element of crime "beyond a reasonable doubt." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 570.) "Typically, the prosecution has the burden to prove a defendant did not act in self-defense, because self-defense negates an element of the offense." (*Id.* at p. 571.) "'To justify an act of self-defense for (an assault charge…) the defendant must have an honest and reasonable belief that bodily injury is about to be inflicted on him.  (Citation.)' (Citation.) The threat . . . must be imminent . . . and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065, italics omitted.) "(A)lthough the test is objective, reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might '"expect() to operate on (defendant's) mind."'" (*Id.* at p. 1065.) In the context of an assault with a deadly weapon, a defendant must show a reasonable fear of great bodily injury. (*People v. Lopez* (1948) 32 Cal.2d 673, 675.)

Where a defendant challenges the sufficiency of the evidence supporting a conviction, our task is to review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  (*People v. Jennings* (1991) 53 Cal.3d 334, 364.)  It is not our function to reweigh the evidence (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206) and reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)  The testimony of a single witness, if believed by the jury, is sufficient to support a conviction, unless that testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal of a conviction for insufficient

evidence is only required if under no hypothesis whatever is there substantial evidence to support the conviction. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

The trial court properly instructed the jury with CALCRIM No. 3470 that a defendant is entitled to the defense of self-defense if (among other things) he "used no more force than was reasonably necessary to defend against (an imminent danger of bodily injury to himself or an imminent danger of being touched unlawfully)." The instruction explained to the jury that "(t)he defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation," and "(i)f the defendant used more force than was reasonable, the defendant did not act in lawful self-defense." If the jury found that Jones "received a threat from someone else that he reasonably associated with Benjamin Vernon or Alexander Wallbrett, (the jury could) consider that threat in deciding whether (he) was justified in acting in self-defense."

Here, even assuming Michaels unlawfully shoved Jones over a bench and the security guards used excess force, the jury could still rationally conclude that Jones did not act in self-defense when he stabbed Vernon and Wallbrett. Videos of the incident, combined with witness testimony, showed that after Michaels shoved Jones, Jones got up and attacked Perezdeleon. Perezdeleon tossed Jones over the railing to get Jones away from other people. Perezdeleon and Martin struggled with Jones until they were able to retreat and deploy their pepper spray.

The slow motion video from Garcia's body camera showed Vernon standing in front of Jones about five to seven feet away, no one to the left of Vernon and a group of people to the right of Vernon about six to eight feet away. Vernon never approached Jones and had his hands up with his palms toward Jones the entire time, trying to calm Jones. Jones had pepper spray on his face and another security guard was administering more pepper spray when Jones attacked Vernon with a knife, stabbing him two times. After Jones almost stabbed Vernon's head, Wallbrett tackled Jones. Jones stabbed Wallbrett multiple times until the security guards jumped in to restrain him.

On this record, viewing the evidence in the light most favorable to the People, reasonable persons could differ on whether Jones justifiably resorted to force or whether the force he used was excessive. Accordingly, the issue whether Jones acted in self-defense was a question of fact for the trier of fact. (*People v. Clark* (1982) 130 Cal.App.3d 371, 378-379, disapproved on other grounds by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) Even if Jones's

1
2
3

testimony supported a finding that he acted reasonably believing in the need to defend himself from a group of uniformed men and used a reasonable amount of force in light of the perceived threat, the jury was not compelled to accept it. For these reasons, Jones's argument fails.

4

(ECF No. 38-1 at 5-9.)

5

"[T]he Due Process Clause protects the accused against conviction except upon

6

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which

7

he is charged." In re Winship, 397 U.S. 358, 364 (1970).  In reviewing a claim of

8

insufficient evidence to support a conviction, "the relevant question is whether, after

9

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of

10

fact could have found the essential elements of the crime beyond a reasonable doubt."

11

Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).  As such, "the

12

applicant is entitled to habeas corpus relief if it is found that upon the record evidence

13

adduced at the trial no rational trier of fact could have found proof of guilt beyond a

14

reasonable doubt." Id. at 324; see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam)

15

("A reviewing court may set aside the jury's verdict on the ground of insufficient evidence

16

only if no rational trier of fact could have agreed with the jury.")  "The Jackson standard

17

'must be applied with explicit reference to the substantive elements of the criminal offense

18

as defined by state law.'" Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004), quoting

19

Jackson, 443 U.S. at 324 n.16.  Additionally, "[a]fter AEDPA, we apply the standards of

20

Jackson with an additional layer of deference." See Juan H. v. Allen, 408 F.3d 1262, 1274

21

(9th Cir. 2005), citing 28 U.S.C. § 2254(d); see also Coleman v. Johnson, 566 U.S. 650,

22

651 (2012) (per curiam) ("We have made clear that Jackson claims face a high bar in

23

federal habeas proceedings because they are subject to two layers of judicial deference.")

24

The state appellate court correctly recognized "the People have the burden of

25

persuasion to show the nonexistence of a defense that negates an element of crime 'beyond

26

a reasonable doubt,'" and specifically with respect to Petitioner's claim of self-defense:

27

"'Typically, the prosecution has the burden to prove a defendant did not act in self-defense,

28

because self-defense negates an element of the offense.'"  (ECF No. 38-1 at 6, quoting

People v. Saavedra, 156 Cal. App. 4th 561, 570, 571 (2007).)   The jury instructions concerning the elements of justifiable homicide self-defense for the attempted murder and attempted voluntary manslaughter of a firefighter counts (counts one and two) directed in relevant part:

The defendant acted in lawful self-defense if:

1.     The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;

2.     The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

AND

3.     The defendant used no more force than was reasonably necessary to defend against that danger.

(CT 688, CALCRIM 505.)   The self-defense instructions for the non-homicide counts (counts three through six) were substantially similar, with the only difference being that the first element instead required "[t]he defendant reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully."   (CT 705, CALCRIM 3470.)   The jurors were additionally instructed if Petitioner "received a threat from someone else that he reasonably associated with" one of the alleged victims, the jurors "may consider that threat in deciding whether [Petitioner] was justified in acting in self-defense." (CT 688, 706.)   Both instructions also directed the prosecution bore the burden of disproving Petitioner's self-defense claims beyond a reasonable doubt.   (See CT 689, 706.)

Petitioner's argument that the evidence was insufficient to disprove self-defense as a matter of law is refuted by the Court's review of the record, which supports the jury's guilty verdict and the reasonableness of the state court's decision upholding Petitioner's convictions.   While Michaels initially pushed Petitioner to start the physical altercation, the evidence shows Petitioner got up and did not go after Michaels, but instead ran at and repeatedly punched Perezdeleon.   (See RT 549) (Perezdeleon testified "as soon as [Petitioner] gets up, right away he goes into a defense mode and he just starts attacking me.

I don't know why.  I wasn't the one who pushed him.  As soon as he got up, he went towards me.")  Scherer similarly testified that after the push by Michaels and while Perezdeleon did not approach Petitioner: "I saw the defendant get up and rush toward Perezdeleon and start hitting him with a closed fist."  (RT 586.)  West also saw Petitioner repeatedly punch a transit officer in the face following the initial scuffle.  (RT 747.)

With respect to Petitioner's altercation with Vernon, it is clear from witness testimony and surveillance video that Vernon had his hands up and appeared to be attempting to verbally diffuse the situation when Petitioner advanced on and stabbed him. Scherer interpreted Vernon's actions as an attempt to calm the situation and did not see Vernon advance on Petitioner but instead saw Petitioner approach Vernon and: "I saw him strike him in the side twice: Once in the lower back, once right below the shoulder."  (RT 590.)  Wallbrett testified after the transit officers sprayed Petitioner with pepper spray: "I see the defendant basically turn from the MTS security guards and clue in on my partner," who was "[d]efenseless, with his hands up."  (RT 621, 629.)  West, meanwhile, "honestly thought that [Petitioner] was going to run north on Park, but what changed was he stopped, turned, and faced Firefighter Vernon," and "[i]t appeared that the defendant was going to come after Ben Vernon," while Vernon was saying "wait, wait" and Vernon had his hands up with his palms out.  (RT 750-51.)  Vernon tried to verbally calm Petitioner down "[t]he whole time" and "was trying to diffuse the situation," spoke faster when he saw Petitioner reach behind himself, and stated he never charged, threatened, or punched Petitioner but instead kept his hands up and "was staring at his waist," stating "when he came running at me, I was just still, like, looking down, trying to see what was there."  (RT 799, 801-02.)

With respect to the altercation resulting in Wallbrett's stabbing, Wallbrett testified he was caring for the patient when he heard a commotion and looked up to see Petitioner "clue in on" Vernon and stated: "There's a look of rage and anger in his face that basically made everything in my body drop to the point to where we -- we get in altercations to restrain people to protect them.  And looking down at my patient, who had now crawled into the fetal position from all the yelling that was going on, I thought in my head, well,

18cv2173 LAB (DEB)

great, I don't have to worry about my patient now.  He's not going to fall and get hurt.
Looks like I have to go get in a fight, and proceeded to run to the defendant and my partner."
(RT 621.)  Wallbrett saw Petitioner charge right at Vernon, stated "the last thing I want
was Ben to be over there by himself without any of us," and "started running as fast as I
can to get there and help him." (RT 628.)  At that point Wallbrett stated Vernon was
"[d]efenseless, with his hands up."  (RT 629.)  When Wallbrett jumped the rail to assist,
he grabbed Petitioner by the shirt and Petitioner "turns and starts what I believed was
punching, trying to punch me," but "[a]fer the first or second one, I actually saw the knife
in his hand and realized that it was a little bit more serious of a situation, yes" and attempted
to restrain Petitioner.  (RT 631-32.)  West similarly recalled Wallbrett "taking the
defendant down, wrapping his arms around the defendant's neck, kind of torso area, and
pulling him to the ground" and "[a]fter they reached the ground, I watched him stab
Firefighter Wallbrett twice in the back" after which West was able to grab Petitioner's wrist
to stop him from stabbing Wallbrett further.  (RT 753-54.)

Rather than requiring a finding of self-defense as a matter of law as Petitioner
contends, it is instead clear based on the evidence presented at trial the state court correctly
concluded it was a question of fact for the jury and "reasonable persons could differ on
whether Jones justifiably resorted to force or whether the force he used was excessive."
(ECF No. 38-1 at 8.)  To conclude Petitioner acted in self-defense, the jury was required to
find at a minimum Petitioner "reasonably believed that he was in imminent danger" of
death or great bodily injury (counts one and two) or bodily injury or of being touched
unlawfully (counts three through six), he "reasonably believed that the immediate use of
deadly force was necessary to defend against that danger" and he "used no more force than
was reasonably necessary to defend against that danger." (CT 688, 705.)  Again, both self-
defense instructions also directed the prosecution bore the burden of disproving Petitioner's
claim of self-defense beyond a reasonable doubt.  (See CT 689, 706.)

While a not guilty finding based on self-defense may have been a potentially
conceivable conclusion for the jury based on the evidence presented at trial, it is not the

role of this Court to reweigh the evidence and habeas relief is not available even in the event the federal habeas court might have reached another outcome. See Cavazos, 565 U.S. at 2 ("[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial . . . a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.")  Instead, under Jackson, the question is not whether Petitioner's self-defense claim is plausible, but instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).  As the state court reasonably concluded: "Even if Jones's testimony supported a finding that he acted reasonably believing in the need to defend himself from a group of uniformed men and used a reasonable amount of force in light of the perceived threat, the jury was not compelled to accept it." (ECF No. 38-1 at 8-9.)  Viewing the evidence "in the light most favorable to the prosecution," as required under Jackson, it is apparent that the jury could have found the prosecution proved beyond a reasonable doubt Petitioner was guilty of two counts of attempted voluntary manslaughter, two counts of assault with a deadly weapon on a firefighter, two counts of battery and did not act in self-defense, either because Petitioner's use of force was not defensible under the circumstances presented or because the amount of force Petitioner employed was more than was reasonably necessary to defend himself.

In view of the state court's detailed discussion of the evidence concerning Petitioner's self-defense claim and reasoned rejection of his assertion that insufficient evidence supported the jury's findings, as well as the deferential standard of review under AEDPA, Petitioner fails to demonstrate that the state court's decision was contrary to, or an unreasonable application of, Jackson, or that it was based on an unreasonable determination of the facts. See Chein, 373 F.3d at 983, quoting Jackson, 443 U.S. at 324 n.16; Juan H., 408 F.3d at 1274; Cavazos, 565 U.S. at 2.

### 8.   __Claim 9__

In Claim 9, Petitioner alleges the cumulative impact of errors violated his federal constitutional rights to a fair trial and due process.  (ECF No. 27 at 82.)  As discussed above, the Court will adjudicate this claim on the merits under a de novo review despite Petitioner's failure to exhaust the additional allegations raised in Claims 3-6.

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 290 n.3 (1973); see also Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'"), quoting United States v. de Cruz, 82 F.3d 856, 868 (9th Cir. 1996).

Here, the only errors are those identified in Claims 1 and 2 concerning the admission of details concerning Petitioner's 2008 conviction and the related photos of Pirone, which the state court reasonably found harmless.  The state appellate court previously rejected Petitioner's prior cumulative error claim which included the allegations raised in Claims 1-2, 7-8 and 10 here, reasoning as follows:

> Jones asserts that the cumulative effect of the errors he described so infected the trial with unfairness as to make his conviction a denial of due process.  Reversal based on cumulative error is required only if a high number of instances of error occurring at trial creating a strong possibility that "the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal.4th 800, 845.) Here, we have found none of Jones's claims of error meritorious or prejudicial.  Accordingly, Jones's claim of cumulative prejudicial error must be rejected. (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

(ECF No. 38-1 at 33-34.)  The Court agrees with the state court assessment that Petitioner's claim of cumulative error based on the state law errors identified in Claims 1 and 2 fail for lack of prejudice.  See Frantz, 533 F.3d at 738-39 (reasoning of state court relevant to determination of whether constitutional error occurred under even a de novo review).  The

Court is not persuaded Petitioner's due process rights were violated.  Parle, 505 F.3d at 927, citing Chambers, 410 U.S. at 290 n.3.  Claim 9 does not merit habeas relief.

## VI.    REQUESTS FOR EVIDENTIARY DEVELOPMENT AND APPOINTMENT OF COUNSEL

Petitioner has also submitted a document entitled "Motion for Discovery in Case #18CV2173 LAB(AGS)," attached to the Traverse, in which he requests the un-redaction of personal information concerning juror questionnaires and the disclosure of jury notes and communications; Petitioner also includes a lengthy proposed list of questions for Juror #10, the trial judge and defense counsel.  (ECF No. 44 at 14-36.)  Upon review, several proposed questions concern whether the juror and judge had any sort of continuing relationship or outside communication at the time of trial and the primary basis for the discovery request clearly stems from Juror #10's presence on the jury.  (See e.g. id. at 34) ("Petitioner is requesting information critical to ground 3 of seating a biased juror.") Numerous proposed questions also touch on the other claims addressed in the instant Order, but primarily to the extent such information impacted the jury's verdict through proposed questions for Juror #10.  (See id. at 17-26.)[7]  Proposed questions for the judge and defense counsel similarly focus on the presence of Juror #10 on the jury.  (See id. at 26-31.)  As with Claim 3 itself, Petitioner's requests are clearly premised on his speculative assertion that the juror's relationship with the judge continued into the trial.  (See id. at 31-32) ("Without a hearing as to determin [sic] whether not only was the relationship concluded as the state court stated in its denial, but expand the record to establish the facts as to the extent of the relationship . . ."); (id. at 33) ("Petitioner asserts that the state courts [sic] factual findings that the relationship was concluded was 'unreasonable' and to make proper

---

[7] Several proposed questions also touch on issues not raised in the instant Amended Petition but raised and addressed in prior state orders.  (See e.g. id. at 25) (proposed questions concerning potential impact on jury of character evidence regarding Officer Pirone); (see also ECF No. 38-1 at 20-22) (state appellate court opinion finding no error in exclusion of character evidence regarding Pirone).

factual findings that the record must be expanded and an evidentiary hearing held.") (citation omitted.)   Petitioner also "requests counsel which is necessary for effective discovery and subpoena to expand the record, protect the jurors [sic] privacy and is required by law." (Id. at 34) (citations omitted.)

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Here, the primary basis for the discovery request is Petitioner's speculative contention, without any record support, that Juror #10 may have had a continuing relationship with the trial judge at the time of Petitioner's trial, but discovery is clearly not appropriate based on speculation. See Calderon v. U.S. District Court for the Northern Dist. of California, 98 F.3d 1102, 1106 (9th Cir. 1996) ("[C]ourts should not allow prisoners to use federal discovery for fishing expeditions to investigate mere speculation.")  Additionally, because as discussed above habeas relief is not warranted on any of Petitioner's claims based on the Court's review of the record, an evidentiary hearing is not necessary in this case. See Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state record.")

Turning to Petitioner's request for appointment of counsel, district courts are provided with statutory authority to appoint counsel in a federal habeas case when a petitioner is financially eligible and "the court determines that the interests of justice so require." 18 U.S.C. § 3006A(a)(2)(b); see also Chaney v. Lewis, 801 F.2d 1191, 1196 (9th Cir. 1986) ("Indigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations.") (citations omitted).  Here, given Petitioner seeks the appointment of counsel for expansion of the record purposes, including discovery and an evidentiary hearing, and because Petitioner's claims clearly fail on the merits and do not warrant habeas relief, the interests of justice do not require appointment of counsel in this instance.  Moreover, it is evident from a review of the extensive pleadings in this case, including the detailed Amended Petition, attached exhibits and Traverse,

Petitioner has demonstrated the ability to clearly articulate his claims and arguments at length and counsel is not necessary to assist Petitioner in this respect.  See LaMere v. Risley, 827 F.2d 622, 626 (9th Cir. 1987) (district court did not abuse discretion is declining to appoint counsel where "district court pleadings illustrate to us that [the petitioner] had a good understanding of the issues and the ability to present forcefully and coherently his contentions."); (see also e.g. ECF No. 27 at 1-94; ECF No. 44 at 1-36.)

## VII.   **CERTIFICATE OF APPEALBILITY**

"A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" Shoemaker v. Taylor, 730 F.3d 778, 790 (9th Cir. 2013), quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000).  The Court finds that a Certificate of Appealability is not warranted because the arguments presented in this habeas action neither deserve encouragement to proceed further nor has Petitioner demonstrated that jurists of reason could find the district court's resolution of Petitioner's claims debatable or wrong.   See 28 U.S.C. § 2253(c)(2) (providing for issuance of a certificate of appealability from a final order in a federal habeas corpus proceeding "only if the applicant has made a substantial showing of the denial of a constitutional right.")

## VIII.   **CONCLUSION AND ORDER**

For the reasons discussed above, the Court **DENIES** the Amended Petition for a Writ of Habeas Corpus, **DENIES** Petitioner's request for discovery and/or other evidentiary development, **DENIES** Petitioner's request for appointment of counsel and **DENIES** a Certificate of Appealability.

**IT IS SO ORDERED.**

Dated:  August 20, 2021

_Larry A. Burns_
_____
Honorable Larry Alan Burns
Chief United States District Judge